## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARK GORRES, et al.,

    Plaintiffs, on behalf of themselves
and others similarly situated,

v.

    Civil Action No.:  1:21-cv-03029-GLR

TIFFANY ROBINSON, in her Official
Capacity as Maryland Secretary of Labor,

    Defendant.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

764843

## TABLE OF CONTENTS

Page(s)

I.  FACTUAL BACKGROUND..........................................................................................2

   A.  Defendant's Delay in Processing and Payment of Unemployment Insurance Claims and Resolution of Claim Disputes ............................................................................ 2

   B.  Experiences of Plaintiffs and Declarants ............................................................. 4

II.  ARGUMENT.......................................................................................................15

   A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ...................................... 15

      1.  Plaintiffs in the Delay and Continued Claims Classes are likely to succeed on the merits of their claims under 42 U.S.C. § 503(a)(1). ............................................................. 15

      2.  Plaintiffs in the Overpayment Class are likely to succeed on the merits of their claims under 42 U.S.C. § 503(a)(1) and (a)(3). ...................................................................... 21

      3.  Plaintiffs in the Delay, Continuing Claims, and Overpayment Classes are likely to succeed on the merits of their federal due process claims. ........................................... 25

      4.  Recent settlements in similar cases award the injunctive relief Plaintiffs seek. ........... 27

   B.  Without a Preliminary Injunction, Plaintiffs and the Classes They Seek to Represent Will Continue to Suffer Irreparable Harm. .............................................................. 28

   C.  The Balance of Equities Favors Plaintiffs and the Classes they Seek to Represent. ......... 32

   D.  Injunctive Relief Will Serve the Public Interest. ............................................... 33

III.  CONCLUSION ....................................................................................................34

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*California Dep't of Hum. Res. Dev. v. Java*,
402 U.S. 121 (1971) ......................................................................... *passim*

*Cosby v. Ward*,
843 F.2d 967 (7th Cir. 1988) ...................................................22, 25, 26

*Cox v. Hess*,
Case No. 3:21-cv-00253-HEH (E.D. Va. May 25, 2021) .................27, 28

*D.A. v. Hogan*,
Case No. 24-C-21-002988, (Balt. City Cir. Ct. Jul. 13, 2021) ...............31

*Fusari v. Steinberg*,
419 U.S. 379 (1975) ..................................................................15, 17

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ................................................................34

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ...................................................................22, 25, 26

*Hanson v. Jensen*,
20-cv-00232 (D.R.I. Nov. 4, 2021) .......................................................27

*Hyatt v. Heckler*,
579 F. Supp. 985 (W.D.N.C. 1984), *vacated on other grounds*, 757 F.2d 1455
(4th Cir. 1985) ................................................................................. *passim*

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
409 F. Supp. 3d 367 (D. Md. 2019) .......................................................15

*Jackson v. City of Aiken Hous. Auth.*,
No. 1:16-CV-02831-JMC, 2016 WL 7228242 (D.S.C. Dec. 14, 2016) ...........................29, 32

*Jenkins v. Bowling*,
691 F.2d 1225 (7th Cir. 1982) .........................................15, 16, 22, 26

*Li v. EFT Holdings, Inc.*,
No. CV 13-8832 DSF (CWX), 2015 WL 12681648 (C.D. Cal. Dec. 14, 2015) ...................24

*Mallette v. Arlington Cty. Employees' Supplemental Ret. Sys. II*,
91 F.3d 630 (4th Cir. 1996) ......................................................25, 26, 27

764843

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................................25

*Mills v. D.C.*,
    571 F.3d 1304 (D.C. Cir. 2009) .............................................................28

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) .................................................................28

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)..............................................................22, 24, 25, 26

*Peter B. v. Sanford*,
    No. CIV.A. 6:10-767-JMC, 2010 WL 5912259 (D.S.C. Nov. 24, 2010)................................29

*Poling v. Foxwell*,
    No. PWG-18-80, 2019 WL 1472304 (D. Md. Apr. 3, 2019)...........................................29, 30

*Reed v. Lukhard*,
    578 F. Supp. 40 (W.D. Va. 1983) ...................................................29, 30, 31

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) ...........................................................28, 30

*Shaw v. Valdez*,
    819 F.2d 965 (10th Cir. 1987) .......................................................22, 25, 26

*Stanley v. Baltimore Cty., Md.*,
    No. CIV.A. AMD 06-944, 2006 WL 1238559 (D. Md. May 5, 2006)............................29, 30

*U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*,
    452 F.3d 275 (4th Cir. 2006) ...................................................................15

*United States v. $41,320 U.S. Currency*,
    9 F. Supp. 3d 582 (D. Md. 2014) ...........................................................24

*Watkins v. Cantrell*,
    736 F.2d 933 (4th Cir. 1984) ...................................................................17

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................15, 32

**Statutes**

42 U.S.C. § 503..................................................................................1, 27

42 U.S.C. § 503(a)(1)....................................................................... *passim*

42 U.S.C. § 503(a)(3)............................................................................21

iii

Md. Code Regs. 09.32.02.02(17) .................................................................17

Social Security Act .......................................................................1, 15, 20

**Other Authorities**

Ava Kofman and Hannah Fresques, *Black Workers Are More Likely to Be Unemployed but Less Likely to Get Unemployment Benefits*, ProPublica (Aug. 24, 2020), https://www.propublica.org/article/black-workers-are-more-likely-to-be-unemployed-but-less-likely-to-get-unemployment-benefits ...................................33

BEACON Mobile App. Report (Sept. 20, 2021), http://dlslibrary.state.md.us/publications/JCR/2021/2021_141.pdf .......................20

Evan Symon, *EDD Changes Unemployment Payment Policy Following Lawsuit*, California Globe (July 23, 2021), https://californiaglobe.com/articles/edd-changes-unemployment-payment-policy-following-lawsuit/ .................................27

Kyle K. Moore, *State unemployment by race and ethnicity*, Economic Policy Institute (Nov. 2021), https://www.epi.org/indicators/state-unemployment-race-ethnicity/ (last visited Nov. 23, 2021) .................................33

Mallory Sofastaii, "Maryland now processing waivers for unemployment claimants who were overpaid," WMAR 2 News (Oct. 27, 2021), https://www.wmar2news.com/unemploymentguide/maryland-now-processing-waivers-for-unemployment-claimants-who-were-overpaid ...................................4

Maryland Dep't of Labor, Tutorial: Viewing Correspondence, https://www.dllr.state.md.us/employment/uibeaconvideo.shtml..........................20

MD Dep't of Labor, Maryland UI Claimant Guide, https://www.dllr.state.md.us/employment/clmtguide/uiclmtpamphlet.pdf ...........................2

Trisha Ahmed, *Maryland Labor Secretary Hears Unemployment App Concerns*, Capital News Service (Oct. 2021), https://cnsmaryland.org/2021/10/29/maryland-labor-secretary-hears-unemployment-app-concerns.................................19

U.S. Dep't of Labor, Benefits: Timeliness and Quality Reports, https://oui.doleta.gov/unemploy/btq.asp.................................3

U.S. Dep't of Labor, Core Measures: State Results, https://oui.doleta.gov/unemploy/ranking.asp.................................3

U.S. Dep't of Labor, UI Data Downloads, https://oui.doleta.gov/unemploy/DataDownloads.asp (last visited Nov. 22, 2021) .................................4

iv

UIPL No. 01-16, https://wdr.doleta.gov/directives/attach/UIPL/UIPL_01-
  16_Acc.pdf............................................................................................................21, 22, 23

UIPL No. 02-16, https://oui.doleta.gov/dmstree/uipl/uipl2k16/uipl_0216.pdf ......................18, 19

UIPL No. 04-01, https://wdr.doleta.gov/directives/attach/UIPL4-01.cfm...................................17

UIPL No. 1145, Attachment at PIV,
  https://wdr.doleta.gov/directives/attach/UIPL/uipl_pre1975/uipl_1145a.cfm .......................17

UIPL No. 23-80, https://oui.doleta.gov/dmstree/uipl/uipl80/uipl_2380.htm ...............................21

764843

Tens of thousands of Marylanders, including Plaintiffs Mark Gorres, Johnathan Smith, Deanne Gilliam, William Sanders, Matthew Bosley, and Michael Edwards, and Declarants Gwenda Harrison, Sean Elliott, Veronica Christensen, Kenneth Knapp, and Sin Yi Lau, have been denied needed unemployment insurance benefits – or been required to repay unexplained and possibly erroneous overpayments – as a result of Defendant Robinson's systematic failures to pay benefits when due, provide a fair hearing, and afford basic due process in violation of 42 U.S.C. § 503 and federal constitutional guarantees.

With this putative class action, Plaintiffs request a preliminary injunction on behalf of themselves and members of three classes they seek to represent – a Delay Class,[1] a Continued Claims Class,[2] and an Overpayment Class[3] – requiring Defendant to comply with the Social Security Act and U.S. Constitution.

---

[1] The Delay Class includes all individuals who at any time within the three years prior to the filing of this action, (a) made an application for UI benefits with MDL; (b) filed at least one weekly claim certification; and (c) neither received benefit payments, nor an appealable determination denying their claim as to each potential benefit type, for more than 21 days after the end of the week in which they filed the application.

[2] The Continued Claims Class includes all individuals who: (a) have received one or more UI benefit payments from MDL within the three years prior to the filing of this action; (b) have filed at least one additional weekly claim for benefits, for which there are payable benefits; and (c) subsequently stopped receiving benefits for a period greater than 14 days without receiving either: (i) an appealable determination or redetermination denying their claim, or (ii) all benefit payments to which they are entitled.

[3] The Overpayment Class includes all individuals who have received one or more UI benefit payments from MDL within the three years prior to the filing of this action and were subsequently issued an overpayment notice without: (a) notice or opportunity to be heard prior to any determination that serves as the basis of the alleged overpayment; or (b) a written determination explaining the factual and legal basis of the overpayment and the right to appeal.

## I.   FACTUAL BACKGROUND

### A. Defendant's Delay in Processing and Payment of Unemployment Insurance Claims and Resolution of Claim Disputes

Defendant Robinson – as Secretary of the Maryland Department of Labor ("MDL" or "the agency") – is responsible for developing and operating a system for the payment of state- and federally-funded unemployment insurance ("UI") benefits[4] to eligible claimants in Maryland. When the COVID-19 pandemic hit, that system quickly became overwhelmed and has remained so, despite Maryland's economic recovery, as reflected in public data on processing and payment times and the issuance of overpayments.

For first-time claims filed between July through September 2021, the most recent quarter for which data are available, Maryland determined claimants' threshold[5] eligibility and paid

---

[4] Five types of UI benefits are relevant to this case. "Regular" UI, established in the wake of the Great Depression, is funded through taxes on private employers and affords eligible claimants benefits for up to 26 weeks of involuntary unemployment. The COVID-19 pandemic prompted the creation of four additional types of federal UI benefits that supplemented Regular UI until their expiration on September 4, 2021: (1) Pandemic Unemployment Assistance ("PUA"), which provided benefits to certain individuals who did not qualify for Regular UI and whose unemployment or inability to work was caused by the pandemic; (2) Pandemic Emergency Unemployment Compensation ("PEUC"), which provided additional weeks of benefits to workers who would otherwise be eligible for UI but had exhausted their 26 weeks of benefits, (3) Mixed Earners Unemployment Compensation ("MEUC"), which provided an additional $100 weekly benefit to recipients of Regular UI or PEUC, but not PUA, who earned income from both employment and self-employment in the prior year, and (3) Federal Pandemic Unemployment Compensation ("FPUC"), which was a supplemental payment for claimants who were eligible for any other type of UI benefit; FPUC paid eligible claimants an extra $600 per week from March 27, 2020 to July 31, 2020, and $300 per week from December 27, 2020 to September 6, 2021.

[5] Maryland has a two-step process for determining claimants' eligibility for UI benefits. First, the agency determines the claimant's threshold, or monetary, eligibility based on the claimant's earnings during the prior year.  Second, the agency investigates the circumstances of the claimant's separation from employment and confirms non-monetary eligibility on that basis. *See*  MD Dep't of Labor, Maryland UI Claimant Guide at 12-14, 18-22, *available at* https://www.dllr.state.md.us/employment/clmtguide/uiclmtpamphlet.pdf.

764843

benefits within 21 days of an application, the legally-required deadline, just 43.2% of the time.[6] In other words, MDL failed to meet mandated timelines for processing over 56% of new claims, inflicting first-time payment delays on approximately 8,850 eligible claimants.[7] At this rate, Maryland ranks 44th among all fifty states plus the District of Columbia, Puerto Rico, and the Virgin Islands in the timely payment of new claims.[8]

Similar delays plague "continuing" claims by Marylanders who have already been determined eligible and received some benefits, but not all benefits due.  In September 2021, MDL made a mere 18.9% of continued payments within the legal deadline of 14 days of the end of the week that it suspended payments on a continuing claim (i.e. from the end of the first week when benefits were claimed but not paid).[9]  This means that MDL failed to pay 81.1% of continued claims for more than two weeks, in violation of the law.[10]  The number of weekly benefit payments in continued claims status that were interrupted for more than two weeks is approximately 45,000.[11]

---

[6] U.S. Dep't of Labor, Benefits: Timeliness and Quality Reports, *available at* https://oui.doleta.gov/unemploy/btq.asp; Decl. of Andrew Stettner, Ex. 12, ¶ 3.

[7] *Id*. at ¶ 5.

[8] U.S. Dep't of Labor, Core Measures: State Results, *available at* https://oui.doleta.gov/unemploy/ranking.asp.

[9] *Id.*; Decl. of Andrew Stettner, Ex. 12, ¶ 4.

[10] *Id.*

[11] *Id.* ¶ 5.

764843

Finally, by MDL's own admission, it has over 87,000 outstanding benefits overpayment cases,[12] and has received over 5,000 requests for overpayment waivers.[13]  Between July and September 2021 alone, the state reported more than 28,000 overpayment cases established, more than 21,000 of which concerned PUA.[14]  In short, MDL has sought to collect allegedly overpaid benefits from thousands of Marylanders who dispute that the overpayment is accurate or owing.

**B. Experiences of Plaintiffs and Declarants**

Plaintiffs' and Declarants' experiences illustrate that Maryland's poor performance on UI metrics are the product of MDL's policies, practices, and customs.  These policies, practices and customs have caused the above (a) protracted delays in the issuance of eligibility determinations and payment of benefits, (b) excessively long interruptions in the payment of benefits, and (c) issuance of and/or collection on benefits overpayments without process meeting the statutory or constitutional minimum.  Plaintiffs and Declarants have suffered harm as a result.  Their experiences, set forth in greater detail in their declarations, are summarized below.

*Plaintiff Mark Gorres*[15]

Mark Gorres submitted a "one-stop" application for all state and federal unemployment benefits, with an initial weekly certification, through the BEACON portal – MDL's web-based

---

[12] MDL uses the term "overpayment" to describe when a claimant receives UI benefits in excess of the eligibility level that MDL has calculated.  An overpayment is not an indication of fraud or wrongdoing and may in fact be the fault of MDL.

[13] *See* Mallory Sofastaii, "Maryland now processing waivers for unemployment claimants who were overpaid," WMAR 2 News, Oct. 27, 2021, https://www.wmar2news.com/unemploymentguide/maryland-now-processing-waivers-for-unemployment-claimants-who-were-overpaid.

[14] *See* U.S. Dep't of Labor, UI Data Downloads, *available at* https://oui.doleta.gov/unemploy/DataDownloads.asp (last visited Nov. 22, 2021).

[15] *See generally* Decl. of Mark Gorres, Ex. 1.

platform for processing all UI claims or all state and federal unemployment benefits – in late May 2021.  In mid-June 2021, the agency flagged Mr. Gorres for fraud and locked him out of BEACON because of a technical error in how he had uploaded his identification documents. Although Mr. Gorres corrected the error immediately upon learning of it, he remained locked out of BEACON until early July, and he remained unable to file weekly certifications even after regaining access. Today, despite his multiple attempts to follow up with MDL, his initial claim remains in "pending" status and MDL has not provided him with either a written determination or payment of benefits.  Without unemployment benefits, Mr. Gorres has had to rely on the Supplemental Nutritional Assistance Program (SNAP or Food Stamps) to avoid going hungry. He has had to take loans from his brother and mother to cover his mortgage, utilities, gas, and other basic expenses, and he has fallen into arrears on his cell phone bill.  In addition, he has been unable to afford medical care needed to address his asthma, hypertension, and diabetes, and his asthma symptoms have noticeably worsened as a result.  Mr. Gorres has suffered a decline in his mental health alongside his physical health, with his precarious financial situation causing stress and feelings of depression.

*Plaintiff Deanne Gilliam*[16]

Deanne Gilliam submitted a one-stop application though MDL's BEACON program, with weekly certification, for all state and federal unemployment benefits in late February 2021. MDL issued an initial determination approving her for Regular UI benefits towards the end of that month, but Ms. Gilliam did not receive it because BEACON does not display all correspondence, and it was difficult for her to locate correspondence on the platform.  This was

---

[16] *See generally* Decl. of Deanne Gilliam, Ex. 2.

particularly true when Ms. Gilliam was using the mobile version of BEACON – her main form

of access, since she does not have a computer – because that version does not contain all

correspondence or action alerts.  MDL did not, in any event, pay any benefits following this

initial determination.  Further, in early March, MDL locked Ms. Gilliam out of her BEACON

account altogether after flagging her for fraud because of a technical error in how she had

uploaded her identification documents.

After months-long efforts to follow up with MDL by email, phone, and in person, Ms.

Gilliam briefly regained access to BEACON in early November 2021 only to lose it days later

with respect to the mobile version and find that even the web version did not consistently

function.  Today, her initial claim remains in adjudication without any final written

determination or payment of benefits.  Because of the decrease in her household's income, she

has started receiving SNAP benefits for her nine-year-old granddaughter, of whom she has

custody, and she has been unable to provide sufficient food and veterinary care for her pets.  She

is also experiencing tremendous stress, including panic attacks, and has had to start taking

medication to manage her anxiety and to fall asleep at night.

*Plaintiff Johnathan Smith*[17]

Johnathan Smith submitted a one-stop application through MDL's BEACON program,

with weekly certification, for all state and federal unemployment benefits on March 1, 2021.

MDL issued a determination of eligibility the next day, which it reaffirmed in September

following an adjudication of the circumstances of his departure from his employment.  Today,

Mr. Smith still has not been paid any benefits for the twelve-week period between early March

---

[17] *See generally* Decl. of Johnathan Smith, Ex. 3.

and mid-May 2021 during which he was determined to be eligible for benefits and filed weekly certifications.  As a result of MDL's failure to pay, Mr. Smith and his fiancée emptied their savings accounts to pay for basic necessities: the mortgage for the house they live in with their four-year-old son, daycare for their son, food, water, electricity and gas, and car payments needed for transportation to their employment, among other things.  With their savings gone, they have no ability to absorb a sudden unexpected expense of even a few hundred dollars, like car repairs.  In Mr. Smith's words, MDL's non-payment rendered his job loss a financial "emergency" and forced him to "tak[e] from a bucket that is not getting replenished."

*Plaintiff Michael Edwards*[18]

Michael Edwards submitted a one-stop application through MDL's BEACON program for all state and federal unemployment benefits on or about November 22, 2020.  Shortly thereafter, MDL froze Mr. Edwards' BEACON account for alleged fraud, requiring him to re-submit his identity documents five times and preventing him from filing weekly certifications.  Mr. Edwards re-gained access to BEACON in February 2021 but remained unable to file weekly certifications until June.  Even with restored BEACON access, Mr. Edwards did not receive all communications related to his benefits; although he had selected the option to receive emails and texts with all updates on his account, BEACON failed to consistently send such emails and its texts did not link to information or updates he could view.  Eventually, on July 2, 2021, MDL determined him eligible for PUA benefits and began paying him the following week, but it did not pay him any benefits for the eight months between his initial application and the eligibility determination despite his repeated inquiries on the matter.  On October 22, 2021, MDL issued

---

[18] *See generally* Decl. of Michael Edwards, Ex. 4.

Mr. Edwards a $4,760 overpayment determination without having previously given him an opportunity to be heard or explaining its basis and how to appeal or seek a waiver.

As a result of MDL's non-payment, and its demand for repayment of benefits, Mr. Edwards has been unable to pay to renew his lapsed car insurance and tags and has been limited to searching for jobs accessible by public transit; so far, he has only been able to find part-time work.  Mr. Edwards also cannot afford to remediate flood damage and resulting mold in his apartment, and he has fallen behind on his rent and utilities, putting him at risk of eviction and an electricity shutoff. He is "at the brink of many bills becoming due," and without any certainty that he can pay them, he is "incredibly stress[ed]."

*Plaintiff Matthew Bosley*[19]

Matthew Bosley submitted an application for all state and federal unemployment benefits through BEACON in early April 2020.  MDL did not determine his initial claim or pay him any benefits until June 21, when it approved and began paying him PUA plus applicable FPUC, after Mr. Bosley had made many dozens of calls and waited on hold for long periods inquiring about his case.  Mr. Bosley continued filing weekly certifications and receiving benefits until January 2021, at which point he secured new employment, stopped seeking UI, and stopped regularly checking BEACON.  In August 2021, Mr. Bosley happened to log into BEACON at the suggestion of a friend who had received a surprise overpayment notice and discovered that, similar to his friend, he had two overpayment determinations from March totaling $33,504. MDL had not emailed him about these determinations notwithstanding that, when he first applied for benefits, he had selected the option for BEACON to send email messages to alert him to all

---

[19] *See generally* Decl. of Matthew Bosley and Attachments, Ex. 5.

updates.  Moreover, MDL had not provided him with any opportunity to be heard prior to making these determinations, nor did it provide him with any notice explaining the legal and factual bases for the overpayments or opportunity to appeal.  MDL has since initiated the process of intercepting Mr. Bosley's tax refund to recoup the full amount of his overpayment, plus fees. The prospect of having to forego his tax refund to begin to re-pay close to $40,000 in benefits has prevented Mr. Bosley from making basic financial decisions, like whether to re-sign his lease or purchase a car, and has caused him significant stress.

*Plaintiff William Sanders*[20]

William Sanders submitted a one-stop application for all state and federal unemployment benefits on or around April 24, 2020. MDL did not issue a determination on his claim until approximately two months later, on June 26, 2020, at which point it began paying him PUA plus the applicable FPUC supplement. In August or September 2020, BEACON began deducting "overpayment offsets" from Mr. Sanders's benefits, later showing an "action item" that reflected an overpayment determination. The action item did not provide any notice of the basis for the overpayment or explanation of how to appeal or seek a waiver.  MDL continued to deduct from Mr. Sanders's benefits, sometimes by the full amount due, and for one period of approximately three months, it froze him out of his BEACON account and stopped paying benefits altogether because a technical error in how he had uploaded his identification documents had flagged him for fraud. Agency representatives have been unable to resolve these matters in response to Mr. Sanders's repeated requests for help.  His overpayment determination currently stands at $35,000, and he has never received any notice explaining its basis or how to appeal.  Mr. Sanders

---

[20] *See generally* Decl. of William Sanders and Attachments, Ex. 6.

also has not received any decision on the waiver request he submitted in October 2020, after learning through his own research that Maryland offers waivers.

Mr. Sanders and his family have not had enough income to pay their basic living expenses as a result of MDL's withholding of his benefits in order to recoup the alleged overpayment.  They have had to rely on food pantries and Meals on Wheels to eat, and they have fallen behind on rent, an experience that has left Mr. Sanders anxious and depressed.  Mr. Sanders has also had to cut back on driving – preventing him from looking for new employment – because he cannot afford gas.  He shared his plight with an MDL representative, stating in one fruitless chat session, "I have no money and my family is hungry."[21]

*Declarant Gwenda Harrison*[22]

Gwenda Harrison submitted a one-stop application through BEACON for all state and federal unemployment benefits in late April 2020.  For several weeks, BEACON did not permit her to file weekly certifications, although an MDL representative confirmed by phone in October that she was eligible for benefits and filed certifications on her behalf. Despite her repeated follow up, MDL did not make a determination on Ms.  Harrison's application or pay her any benefits until June 14, 2021, at which point it approved her for PUA and applicable FPUC for the entire fourteen-month period since her initial application.  Even then, it did not pay her the FPUC it had approved and did not pay her any PUA or FPUC for a total of 29 weeks in the approved period.  It was not until September 24, 2021, after her further repeated emails to the agency, that Ms. Harrison received the $17,557 in unpaid benefits she was still owed.

---

[21] *See* Decl. of William Sanders, Ex. 6, Attachment A.

[22] *See generally* Decl. of Gwenda Harrison, Ex. 7.

*Declarant Sean Elliott*[23]

Sean Elliott submitted a one stop application for all state and federal unemployment benefits on approximately March 9, 2021.  Within one week, MDL determined Mr. Elliott eligible for Regular UI and applicable FPUC and began paying him weekly.  However, MDL stopped paying all benefits on or about April 26, 2021, when Mr. Elliott received a severance payment from his former employer which he had reported in his initial application and reported again after receipt.  Mr. Elliott's BEACON account showed a "pending" "adjudication" for "severance pay" but did not provide any notice (or, at least, any notice he could locate on the portal) of redetermination of eligibility or benefits termination, nor did it explain the legal or factual reasons why payments were on hold; Mr. Elliott's repeated calls to the agency also did not yield this information.  Without any benefits, Mr. Elliott fell behind on rent and his landlord sought to evict him; he eventually secured rental assistance to stave off an eviction scheduled for September 30, 2021.  He borrowed thousands of dollars from friends and family to cover basic expenses like rent, food, water, electricity, and his cell phone.  He had used some of the severance money to make $200 monthly payments to a friend towards the purchase of the friend's used car, but he had to return the car because he could not continue the payments; as a result, he had no transportation and no way of getting to employment opportunities. MDL's failures have taken a toll on Mr. Elliott's mental health.  In his words:

> The experience changed me as a person.  I was in a constant state of worry and anxiety. It hurt my relationship with my partner because I felt like I was on edge and more irritable – my mind was constantly racing and I felt like a ball of stress and nerves.  It put a strain on other relationships, too, because I had to borrow money from family and friends.  For months, I would lie in bed trying to get some rest but I could not stop thinking about how my life was falling apart; sometimes I would not be able to fall asleep

---

[23] *See generally* Decl. of Sean Elliott, Ex. 8.

until the sun came out.  I felt like what I was fighting for was the lifeline that was put in place so people would not have to deal with this.

After repeated follow up with MDL – including dozens of calls and emails – Mr. Elliott finally received his unpaid benefits on October 18, 2021.

*Declarant Veronica Christensen*[24]

Veronica Christensen applied for and began receiving Regular UI in August 2019.  After launching BEACON, MDL had her set up an account on the portal to manage her claim.  On November 19, 2020, BEACON issued correspondence indicating that MDL had assessed Ms. Christensen an overpayment in the amount of $3,440 but did not explain the basis for the overpayment or how she could appeal; MDL also did not provide Ms. Christensen an opportunity to be heard before making the overpayment determination.  Nonetheless, after realizing that she had been paid two types of benefits for certain weeks, Ms. Christensen paid the $3,440 in full.  However, on February 25, 2021, BEACON issued another overpayment notice – again unaccompanied by any explanation for its basis or opportunity to appeal – that charged her a second time for the same overpayment of $3440. MDL proceeded to deduct Ms. Christensen's benefits until it had recouped this full amount, in addition to her earlier payment.  Only in November 2021, following eight months of persistent follow-up with the agency, did Ms. Christensen receive notice from MDL that it would send her a refund for the duplicate overpayment it had collected.

Ms. Christensen experienced significant financial strain because of MDL's double charging her for overpaid benefits.  Her 14-year old car recently broke down, but she could not afford a new one and instead has had to pay $1,600 in repairs, likely more than the value of the

---

[24] *See generally* Decl. of Veronica Christensen, Ex. 9.

vehicle but less than half of what MDL owed her.  She also had to sell some of her possessions

and dip into her retirement savings to afford my basic living expenses, including paying $8,000

for repairs to her home after a flood.  At 67 years old, Ms. Christensen feared that depleting her

retirement savings will put her at risk of being unable to cover her basic living expenses when

she can no longer work.

*Declarant Kenneth Knapp*[25]

Kenneth Knapp submitted a one-stop application through BEACON for all state and

federal unemployment benefits on April 28, 2021.  MDL made an initial determination of

eligibility for Regular UI the following day but did not begin paying benefits, indicating in

BEACON that Mr. Knapp's claim was pending "adjudication."  Mr. Knapp called and emailed

MDL to follow up multiple times per week, but was only rarely able to connect with an agency

representative.  On September 1, 2021, MDL issued a further determination, this time stating

without explanation that Mr. Knapp had been fired for "gross misconduct" and thus was

ineligible for benefits.  Mr. Knapp appealed that determination.  During the appeal process, a

hearing officer advised him that MDL should have provided notice detailing his former

employer's accusation of gross misconduct but that it was "common" for claimants like Mr.

Knapp not to receive the required notice through BEACON.  The appeal was ultimately

successful and Mr. Knapp received a decision establishing that he was entitled to benefits from

July 4, 2021 onwards. MDL then issued payments for the covered weeks but, on October 7,

issued a determination that it had overpaid Mr. Knapp by $8,290; the agency had not provided

Mr. Knapp any prior opportunity to be heard with respect to the overpayment determination, nor

---

[25] *See generally* Decl. of Kenneth Knapp, Ex. 10.

did it advise him of the basis for the determination or explain how to appeal.  Although MDL

eventually removed the overpayment from Mr. Knapp's BEACON account after his weeks of

persistent advocacy, MDL's months-long delay in processing his benefits claim forced him to

spend down his all of savings and dip into his 401(k), an experience he describes as "extremely

stressful."

*Declarant Sin Yi Lau*[26]

Sin Yi Lau submitted a one-stop application for all state and federal unemployment

benefits on May 12, 2020.  On June 22, 2020, she received a determination of eligibility and

began to receive benefits payments.  MDL issued Ms. Lau various notices thereafter, indicating

without explanation that it was shifting her between different benefit types and amounts, but Ms.

Lau was frequently unable to find them because BEACON does not automatically display all

correspondence.  In July 2021, without providing her any prior opportunity to be heard, MDL

issued Ms. Lau an overpayment determination for $33,925.  The notice did not state the basis for

her overpayment or explain how she could appeal.  After months of follow up with agency

representatives, MDL eventually removed the overpayment.  The anxiety experienced by Ms.

Lau in trying to determine whether she would have to repay nearly $34,000 to the state is

palpable in this email from her to MDL, one of many she sent prior to securing a resolution:

> [T]oday my Beacon account is saying I owe $25,240.  Though less than the
> original $33,925 I was assigned, it is still a massive amount of debt.  NOTHING
> is making sense in my portal, and I am just so confused and at my wit's end about
> this.  IS THERE ANYONE THAT WILL HELP ME?  The system is obviously
> broken and sending out glitched up calculations.  But this is my life.  A glitch like
> this can ruin it. WHAT IS GOING ON?

---

[26] *See generally* Decl. of Sin Yi Lau, Ex. 11.

14

## II.     ARGUMENT

Fed. R. Civ. P. 65 provides for the issuance of preliminary injunctions as a means of preventing harm to a party before the court can fully adjudicate the claims in dispute.  "A preliminary injunction maintains a particular relationship between the parties in anticipation of a decision on the merits, pending completion of the litigation." *U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.,* 452 F.3d 275, 280 (4th Cir. 2006). Courts award preliminary injunctive relief where the movant has established that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  In the context of class actions, courts may issue a class-wide preliminary injunction "before certification of a class" on the basis of likely harm "to [the] putative class as a whole."  *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (internal citations and punctuation omitted).  Plaintiffs have satisfied the standards of Rule 65 and demonstrated their entitlement to class-wide preliminary injunctive relief.

### A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

#### 1.  Plaintiffs in the Delay and Continued Claims Classes are likely to succeed on the merits of their claims under 42 U.S.C. § 503(a)(1).

Section 303(a)(1) of the federal Social Security Act ("SSA"), codified at 42 U.S.C. § 503(a)(1), requires states to use "methods of administration . . . reasonably calculated to insure full payment of unemployment compensation when due."  42 U.S.C. § 503(a)(1).  "The basic thrust of the statutory 'when due' requirement is timeliness."  *Fusari v. Steinberg*, 419 U.S. 379, 387-88 (1975) (quoting *California Dep't of Hum. Res. Dev. v. Java*, 402 U.S. 121, 130-133 (1971)); *see also Jenkins v. Bowling*, 691 F.2d 1225, 1230 (7th Cir. 1982) ("[T]he federal statute desiderates prompt payment to eligible applicants[.]").  "Early payment of insurance benefits"

serves the Congressional objectives of the statute, including "to maintain the recipient at subsistence levels without the necessity of his turning to welfare or private charity," to "assist[] a worker to find substantially equivalent employment" and to "prevent a decline in the purchasing power of the unemployed, which in turn serves to aid industries producing goods and services." *Java*, 402 U.S. at 131-32.  "[D]elaying compensation until months have elapsed defeats these purposes."  *Id.* at 133; *see also Jenkins*, 691 F.3d at 1229 ("Both the humane (or redistributive) objectives of unemployment insurance and its macroeconomic objective (dampening the business cycle by keeping up the purchasing power of people laid off in a recession) require that unemployment compensation be paid as promptly as possible after the worker is laid off.").

Interpreting the "when due" mandate of 42 U.S.C. § 503(a)(1) in line with its legislative intent, the Supreme Court has invalidated state procedures that require claimants to wait for several weeks or months to receive unemployment benefits for which they are ultimately eligible.  In *Java*, 402 U.S. at 121, the Court examined California's policy of approving former employees for unemployment benefits based on an application and interview but then automatically suspending those benefits if their employer filed an appeal; the suspension was for the duration of the appeal process, which lasted on average seven weeks.  The Court concluded that, in such a process, the initial application phase was sufficient to establish the individual's eligibility for benefits and thus benefits should be paid without interruption upon that preliminary eligibility determination.  *Id*. at 133-34.  Subsequently halting the payment of benefits for seven weeks upon the employer's filing of an appeal was a measure "not 'reasonably calculated to insure full payment of unemployment compensation when due'" and "frustrate[d]" Congress's aim of guaranteeing unemployed workers prompt access to income support. *Id*. at 133, 135.

Four years later, in *Fusari v. Steinberg*, 419 U.S. 379 (1975), the Court considered Connecticut's system of unemployment compensation administration which, until shortly before the appeal, required claimants to go without benefits for an appeal period of more than 100 days if a first-level claims examiner found them ineligible.  The Court "determine[d] on this record that Connecticut's previous system often failed to deliver benefits in a timely manner," as required by § 503(a)(1). *Id.* at 388.

*Java* and *Fusari* together establish that under 42 U.S.C. § 503(a)(1), a state cannot operate an eligibility determination process that unduly delays payment of benefits of those ultimately determined to be eligible, nor can it cease to pay benefits to those previously determined eligible prior to any new determination of ineligibility.  The U.S. Department of Labor ("DOL") has operationalized this controlling precedent by requiring that, to be timely under the SSA, a state unemployment agency must issue determinations in connection with initial claims within 21 days of the first compensable week.[27]  Unemployment Insurance Program Letter ("UIPL")[28] No. 1145 Attachment at ¶ IV, available at

https://wdr.doleta.gov/directives/attach/UIPL/uipl_pre1975/uipl_1145a.cfm.

Likewise, once the agency has determined an applicant eligible, it must afford the applicant a "presumption" of continued eligibility.  UIPL No. 04-01 at ¶ 7, available at https://wdr.doleta.gov/directives/attach/UIPL4-01.cfm ("[In] the absence of facts clearly

---

[27] In Maryland, the first compensable week begins the Sunday of the week in which the claim is filed, as the benefit "week," under MD's UI law, is Sunday to Saturday. *See* Md. Code Regs. 09.32.02.02(17).

[28] The DOL publishes Unemployment Insurance Program Letters ("UIPLs") as "interpretive" guidance on the statutes the agency is responsible for enforcing.  *Watkins v. Cantrell*, 736 F.2d 933, 943 (4th Cir. 1984). The Fourth Circuit has held that, as the products of agency expertise, these letters are "entitled to deference" and "considerable weight."  *Id.* at 944.

17

establishing current ineligibility, the State agency presumes the claimant's continued eligibility until it makes a determination otherwise."). If a question arises after an individual has begun receiving benefits about whether he or she remains qualified for those benefits, the agency may halt payment for up to 14 days to redetermine eligibility. *Id.* at ¶ 6. If it has not issued a redetermination within 14 days, it must resume payments. *Id.* In addition to adhering to these timelines, agencies must not create "procedural, technological, or informational" "barriers" that prevent individuals from accessing UI benefits." UIPL No. 02-16 at ¶ 4(a), available at https://oui.doleta.gov/dmstree/uipl/uipl2k16/uipl_0216.pdf.

Here, MDL does exactly what 42 U.S.C. § 503(a)(1) prohibits: for over fifty-six percent of initial claims and over eighty-one percent of continuing claims, it delays the determination of applicants' eligibility and payment of benefits well beyond the applicable 21-day (initial) and 14-day (continuing) timelines. Plaintiffs' and Declarants' experiences exemplify these rampant delays. Plaintiff Mark Gorres has been waiting five months since making his initial application and has still received neither benefit payments nor a determination of ineligibility, while Plaintiffs Deanne Gilliam and Johnathan Smith have each been waiting *eight* months. Plaintiffs Matthew Bosley, William Sanders, and Michael Edwards likewise waited between two and eight months for initial determinations, and Declarant Gwenda Harrison, meanwhile, waited a full fourteen months after her application for benefits for a determination of her eligibility for federal benefits. Declarant Knapp did not receive an initial determination that he was *not* eligible for benefits until more than four months after his initial application, which delayed his successful appeal of that determination and his subsequent receipt of benefits by as much time.

Even with respect to individuals it has already determined eligible, MDL – like the California agency in *Java* – fails to pay benefits for prolonged periods in the absence of any

redetermination of eligibility.  For example, despite having been determined eligible, Plaintiff

Smith has yet to receive 12-weeks of benefits owed for the period of early March to mid-May

2021, and Plaintiff Edwards has yet to receive a full 8 months of benefits from the date of his

application in November 2020 through MDL's determination of his eligibility in early July 2021.

Similarly, Plaintiff Sanders received no benefits for a period of three months, Declarant Elliott

received no benefits for over 21 weeks, and Declarant Harrison did not receive 29 weeks of

benefits for which she had been approved for a period of approximately three months.

     Far from being isolated or unrelated, these delays in the processing and payment of new

and continued claims arise out of policies, practices, and customs implemented by MDL that

create "technological, procedural, or informational" barriers to individuals' receipt of benefits.

UIPL 02-16.  For example, as illustrated by Plaintiffs' experiences and admitted in some

instances by Defendant:

- MDL systematically flags claims for fraud in BEACON – and, on this basis, indefinitely suspends completion of eligibility determinations and payment of benefits – if applicants make mistakes in complying with MDL's technical document submission procedures.[29] An applicant may prompt a fraud inquiry, for instance, if she uploads a "scan" of her identity documents rather than a photograph, or if she uses a photograph that does not display all four corners of the document.[30]

- BEACON does not readily display critical correspondence, meaning that claimants routinely miss information relevant to their claims, generating delay.  The web version requires users to click counterintuitively through a blank search form, whereas the mobile version does not contain all correspondence or action alerts at all.[31]

---

     [29] *See* Gorres Decl., Ex. 1 ¶¶ 8-9; Gilliam Decl., Ex. 2 ¶¶ 9, 16,18; Edwards Decl., Ex. 4 ¶ 9; Sanders Decl., Ex. 6 ¶¶ 19-21; Trisha Ahmed, *Maryland Labor Secretary Hears Unemployment App Concerns*, Capital News Service, Oct. 2021, https://cnsmaryland.org/2021/10/29/maryland-labor-secretary-hears-unemployment-app-concerns (quoting Maryland lawmaker who reports that constituents' unemployment cases are being "closed en masse," often based on MDL's allegations of fraud).

     [30] *See* Gilliam Decl., Ex. 2 ¶ 16; Sanders Decl., Ex. 6 ¶ 20.

     [31] *See* Gorres Decl., Ex. 1 ¶ 7; Gilliam Decl., Ex. 2 ¶ 8; Harrison Decl., Ex. 7 ¶ 7; Lau

- Even outside the context of lockouts related to alleged fraud, BEACON periodically prevents claimants from filing weekly certifications of their continued eligibility for UI benefits, as needed to secure benefits.[32]

- With respect to individuals with continuing claims, MDL puts claims on hold indefinitely if any question arises as to continuing eligibility – such as where it halted benefits payments to Mr. Elliott for nearly six months to "validate the severance" in his case.[33]

- MDL has a policy, practice, or custom of failing to respond promptly or substantively to queries from claimants. Nearly all Plaintiffs and Declarants share a common experience of repeatedly contacting MDL – by phone, email, online chat, and in-person appointments – either without reaching anyone at all or without receiving any response to their complaints beyond agency representatives' offers to put in service tickets or promises that problems will eventually be resolved.[34]

The combined effect of these various policies, practices, and customs is a failure by MDL to pay benefits timely to those determined eligible that "frustrate[s]" the purposes of the Social Security Act. *Java*, 402 U.S. at 133, 135. Plaintiffs are likely to succeed on the merits of their claim that Defendant is violating 42 U.S.C. § 503(a)(1).

---

Decl., Ex. 11 ¶ 8; *see also* Maryland Dep't of Labor, Tutorial: Viewing Correspondence, https://www.dllr.state.md.us/employment/uibeaconvideo.shtml (explaining that claimants must perform a blank search to access correspondence on the BEACON web portal; BEACON Mobile App. Report, Sept. 20, 2021, *available at* http://dlslibrary.state.md.us/publications/JCR/2021/2021_141.pdf (admitting that the mobile version of BEACON does not allow users to view all correspondence or view or complete action alerts, and that it does not allow users to initiate new or additional claims, upload documents, view overpayment details, or take other critical actions).

[32] *See* Gorres Decl., Ex. 1 ¶ 12; Edwards Decl., Ex. 4 ¶ 10; Harrison Decl., Ex. 7 ¶¶ 8, 13.

[33] *See* Elliott Decl., Ex. 8 ¶¶ 8, 10, 11; *see also* Letter from Congressional Delegation to Sec'y Robinson (Aug. 27, 2021) with Response (Sep. 2, 2021), Ex. 13 (admitting that MDL automatically puts claims "on hold" when issues arise for an unspecified period).

[34] *See* Gorres Decl., Ex. 1 ¶¶ 9-10; Gilliam Decl., Ex. 2 ¶¶ 11, 13, 20; Edwards Decl., Ex. 4, ¶¶ 14, 16, 17, 18; Bosley Decl., Ex. 5 ¶¶ 8, 11, 12; Sanders Decl., Ex. 6 ¶¶ 9, 14, 20, 23, 32, Attachment A, B; Harrison Decl. Ex. 7 ¶¶ 8, 13, 18; Elliott Decl., Ex. 8 ¶¶ 11, 12; Christensen Decl., Ex. 9 ¶¶ 9, 12, 16; Lau Decl., Ex. 11 ¶¶ 25-27, 33.

**2. Plaintiffs in the Overpayment Class are likely to succeed on the merits of their claims under 42 U.S.C. § 503(a)(1) and (a)(3).**

Section 303(a)(3) of the SSA, codified at 42 U.S.C. § 503(a)(3), requires that states provide an "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." 42 U.S.C. § 503(a)(3). "A denial of a claim for compensation for the purposes of . . . [s]ection 303(a)(3) exists in any case in which there is an adverse determination which places an individual in a less advantageous position as to benefit entitlement." UIPL No. 23-80 at ¶ 6, available at

https://oui.doleta.gov/dmstree/uipl/uipl80/uipl_2380.htm. Assessments of benefits overpayments are thus "denials" subject to 42 U.S.C. § 503(a)(3). UIPL No. 01-16 at ¶ 4(e), available at https://wdr.doleta.gov/directives/attach/UIPL/UIPL_01-16_Acc.pdf; *see also id.* at ¶ 4(b) (directing that, under Java's interpretation of 42 U.S.C. § 503(a)(3), states must give benefits recipients an "opportunity to be heard" "before making an overpayment determination or initiating recovery").

As applied to overpayments, 42 U.S.C. § 503(a)(3) – along with § 503(a)(1) – includes several specific procedural safeguards. "*Before* making an official determination that a payment is improper," an unemployment agency must "conduct an investigation, which includes promptly contacting the individual to whom the potential overpayment was made." UIPL No. 01-16 at ¶ 4(a) (emphasis added). "[W]hen there is a factual conflict between the information received from an individual and other information received by the agency, from any source, it is incumbent upon a state to make further contact with the individual, inform him or her of the conflict, and allow an opportunity for rebuttal." *Id.* at ¶ 4(b). "States are not required to conduct a full, formal evidentiary appeal hearing before determining that an individual was overpaid, but they must offer the individual an opportunity to know and rebut the information in

fact finding before issuing a decision that the individual is not eligible and was overpaid."  *Id.* at ¶ 4(e). During this pre-determination period, an agency must continue to timely make any UI payments that are due without reduction or offset to recover the overpayment.  *Id.* at ¶ 4(b) (explaining that the pre-determination process for determining overpayments, and the continued payment of benefits during that process, is necessitated by *Java*'s interpretation of § 503(a)(1)).

If, after this process, an agency determines that a claimant was overpaid, it must provide the claimant with "written notice" containing "sufficient information" to enable the claimant to "understand the determination[], the reasons therefor, and their right to protest, request reconsideration or appeal."  *Id.* at ¶ 4(c).  These requirements are co-extensive, at a minimum, with those of constitutional due process.  *See Cosby v. Ward*, 843 F.2d 967, 982 (7th Cir. 1988) ("Whether the statutory 'fair hearing' requirement has been met is tested by the same standards as constitutional procedural due process."); *Shaw v. Valdez*, 819 F.2d 965, 970 n.7 (10th Cir. 1987) (observing without holding that "both the 'fair hearing' issue under the Act and the constitutional [due process] question appear to be indistinguishable in this instance"); *Jenkins*, 691 F.2d at 1235 ("Presumably the statutory requirement for a fair hearing is not less exacting than the constitutional one, so whatever remedy puts the defendants in compliance with section 303(a)(3) should equally or more certainly put them in compliance with the due process clause.").  Thus, notice must be "timely," *Goldberg*, 397 U.S. at 267-68, and "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Further, states that allow for waiver of overpayments – including Maryland – "must clearly communicate the potential availability of a waiver to individuals when establishing an overpayment and, if an individual requests a waiver, make an

22

official determination on the waiver request before initiating overpayment recovery."  UIPL No. 01-16 at ¶ 4(a).

   MDL's policies, practices, and customs concerning overpayments violate 42 U.S.C. § 503(a)(1) and (3).  As illustrated by the experiences of Plaintiffs Bosley, Sanders, and Edwards and Declarants Christensen, Knapp, and Lau, the agency issues overpayment determinations without first "contacting the individual to whom the potential overpayment was made" to provide an opportunity for rebuttal.[35]  These determinations are not accompanied by any explanation of their legal or factual basis or a procedure for appeal.[36]  Moreover, where the overpayment notice appears in the form of a BEACON "alert" or "action item" rather than correspondence, as was true for Mr. Sanders, it also contains no information on how a claimant can seek a waiver.[37]  For individuals who are still receiving benefits at the time of such a determination, MDL then proceeds to offset benefit amounts or intercept tax refunds to collect on the overpayment, as in the cases of Plaintiffs Sanders and Bosley and Declarant Christensen, notwithstanding that the individual has had no opportunity to either participate in the pre-determination investigation, appeal the determination, or request (much less secure a decision on) a waiver.[38]

---

   [35] *See* Edwards Decl., Ex. 4, ¶ 19; Bosley Decl., Ex. 5 ¶¶ 18-21; Sanders Decl., Ex. 6 ¶¶ 13-15, 34; Christensen Decl., Ex. 9 ¶¶ 5, 7-8; Lau Decl., Ex. 11 ¶¶ 21-23; Knapp Decl., Ex. 10 ¶ 13.

   [36] *Id.*

   [37] *See* Sanders Decl., Ex. 6 ¶ 5.

   [38] *See* Bosley Decl., Ex. 5 ¶ 25; Sanders Decl., Ex. 6 ¶¶ 13-15, 34; Christensen Decl., Ex. 9.

764843

Moreover, MDL's practice of relying exclusively on BEACON to deliver notice of overpayment determinations is not "reasonably calculated" to afford actual notice of such determinations, *Mullane*, 339 U.S. at 314, where the platform:

- Permits or requires applicants to elect a non-BEACON method of communication about their claims – such as email – but even for those applicants that choose an alternate method delivers notice through BEACON only;

- Hides "correspondence"; as described previously, applicants can access all correspondence through the web-based platform only by clicking through a blank search, and they cannot access all correspondence on the mobile application at all;

- Locks out applicants who have been flagged for fraud, including on the basis of technical or clerical errors; and

- Fails to email, mail, or otherwise use independent means to communicate about overpayments with applicants who are no longer seeking to receive benefits – like Matthew Bosley – and thus have no reason to check BEACON.

In each of these scenarios, claimants either lack access to BEACON altogether, cannot be reasonably expected to find relevant content on BEACON, or would have no reason to log into the platform. Using BEACON alone to deliver notice does not, under these circumstances, meet the requirements of due process. *See, e.g., Li v. EFT Holdings, Inc.*, No. CV 13-8832 DSF (CWX), 2015 WL 12681648, at *2 (C.D. Cal. Dec. 14, 2015) (posting notice on company website would be inadequate to afford notice to class members where *inter alia* "counsel could not articulate a persuasive reason to believe that the absent class members would know to check [company] website for such a notice"). *United States v. $41,320 U.S. Currency*, 9 F. Supp. 3d 582, 585 (D. Md. 2014) (posting notice of forfeiture proceeding on government website insufficient to notify property holder of the proceeding where property holder was incarcerated and could not access the website). Delivery of notice only through BEACON, under these circumstances, is not a means likely to "actually inform[]" claimants of MDL's denial of their benefits – particularly given that MDL undertook to learn claimants' communication preferences

24

and then failed to provide critical communications via those preferences. *Mullane*, 339 U.S. at 315. Plaintiffs are likely to succeed on the merits of their claim that Defendant's failure to provide notice and a fair opportunity to be heard violates 42 U.S.C. § 503(a)(1) and (a)(3).

### 3. Plaintiffs in the Delay, Continuing Claims, and Overpayment Classes are likely to succeed on the merits of their federal due process claims.

Individuals have a constitutionally cognizable property interest in access to social safety net payments, including unemployment benefits. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (Social Security disability benefits); *Goldberg v. Kelly*, 397 U.S. 254, 263-64 (1970) (welfare benefits); *Cosby*, 843 F.2d at 982-6 (extending *Goldberg* to unemployment insurance). This includes an interest both in the continued receipt of benefits for which they have been determined eligible, *id.*, and the potential to receive benefits for which they have applied and to which they have a legitimate claim of entitlement. *Mallette v. Arlington Cty. Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 637 (4th Cir. 1996) ("[A] person may hold a property interest in a benefit even before it has been determined that she is, in fact, eligible for the benefit") (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).[39]  Accordingly, the government must afford individuals due process – both notice and an opportunity to be heard – when depriving an individual of benefits, either by formal denial or prolonged failure to determine eligibility and attendant non-payment of benefits. *Mathews*, 424 U.S. at 332-33*; Goldberg,* 397 U.S. at 264*; Mallette*, 91 F.3d at 637.  To pass constitutional muster, notice must be "timely and adequate . . . detailing the reasons for a proposed termination." *Goldberg*, 397 U.S. at 267-68; *see also Shaw*, 819 F.2d 965, 968 (applying *Goldberg*'s requirements with

---

[39] This is at least true with respect to benefits that are awarded on a non-discretionary basis to those who meet clear eligibility requirements. *Mallette*, 91 F.3d at 635-36.

respect to notice to a case involving a deprivation of unemployment benefits).  Notice must also

be "reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections."  *Mullane v.*

*Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950).

For the Overpayment class, the requirements of due process align with those of 42 U.S.C.

§ 503(a)(3).  *See Cosby*, 843 F.2d at 982; *Shaw*, 819 F.2d at 971 n. 7; *Jenkins*, 691 F.2d at 1235.

Thus, insofar as MDL's policies and practices violate § 503(a)(3) they are similarly unlawful

under the federal due process guarantee for the reasons stated at Part II.A.2, *supra*.  To the extent

there is any light between the requirements of § 503(a)(3) and due process, the latter arguably

affords even greater protection on the question of when a hearing concerning the deprivation of

benefits must occur.  The DOL has interpreted § 503(a)(3) to permit a hearing promptly *after* an

overpayment determination, though other procedural safeguards must be in place.  By contrast,

the Supreme Court held in *Goldberg* that hearings should occur *prior to* the termination of

benefits, in order to minimize the extent to which individuals are left without a means to pay for

"essential food, clothing, housing, and medical care" during the pendency of a dispute over the

individual's eligibility.  *See* 397 U.S. at 264 (holding that "only a pre-termination evidentiary

hearing provides the [welfare benefits] recipient with procedural due process" because

"termination of aid pending resolution of a controversy over eligibility may deprive an eligible

recipient of the very means by which to live while he waits").

Due process also affords protections to the members of the Delay and Continued Claim

classes insofar as it applies to individuals who have a "legitimate claim of entitlement" to

unemployment benefits regardless of whether the agency has issued a formal denial.  *Mallette*,

91 F.3d at 635.  Like the plaintiff in *Mallette*, Mr. Gorres, Ms. Gilliam, Mr. Smith, and other

members of the Delay and Continuing Claims classes applied for benefits and have a statutory

right to either receive them if they meet (or continue to meet) defined eligibility criteria or to

receive an appealable denial.  *Id*.  Instead, MDL has effectively deprived these Plaintiffs and

class members of benefits – by virtue of their prolonged delay in issuing determinations and

payments – without affording any process, including at a minimum an appealable determination.

> **4.  Recent settlements in similar cases award the injunctive relief Plaintiffs seek.**

Four recent cases have raised and at least preliminarily settled statutory claims similar to

those at issue in this case.  In *Hanson v. Jensen*, 20-cv-00232, filed in the U.S. District Court for

Rhode Island, named plaintiffs alleged that the state agency had stopped their unemployment

benefits without notice or explanation one month after finding them eligible, alleging violations

of 42 U.S.C. § 503 and due process.  The parties' settlement, finalized earlier this month,

required defendant to reform its policies and practice to ensure that all claimants received

adequate notice and a meaningful opportunity to appeal benefits terminations.  *See* Stipulation of

Settlement, 20-cv-00232, ECF No. 27 (Nov. 4, 2021), available at

https://riaclu.org/sites/default/files/field_documents/hansonsettlement.pdf.  In *Center for

Workers' Rights v. California Employment Development Department and Rita Saenz*, filed in the

Superior Court for Alameda County, California, named plaintiffs – like their Rhode Island

counterparts – also allege legal violations based on the state's suspension of unemployment

recipients' benefits without notice for more than two weeks.  Following the filing of the

complaint, California instituted a "pay now" policy, restarting benefits for covered individuals.

*See* Evan Symon, *EDD Changes Unemployment Payment Policy Following Lawsuit*, California

Globe, July 23, 2021, available at https://californiaglobe.com/articles/edd-changes-

unemployment-payment-policy-following-lawsuit/.  In *Cox v. Hess*, Virginia's unemployment

agency resolved statutory "when due" and due process claims on behalf of unemployed workers

764843

claiming delayed and interrupted benefits with an agreement requiring the agency to meet certain benchmarks for prompt processing and payment of claims, and to improve communication with claimants. *See Cox v. Hess*, Case No. 3:21-cv-00253-HEH (ECF No. 24) (E.D. Va. May 25, 2021). Finally, in *Arrington v. Employment Security Department et al*, Washington's state unemployment agency entered into a settlement requiring it to promptly resolve a backlog of unpaid claims, and to meet performance standards for claims processing and payment going forward (Superior Ct. Thurston Cty, Case No. 20-2-01640-34, Oct. 28, 2021).

Plaintiffs allege statutory and constitutional claims, based on similar facts, analogous to those of their counterparts in these recent cases. They are well-justified in seeking the same relief.

**B. Without a Preliminary Injunction, Plaintiffs and the Classes They Seek to Represent Will Continue to Suffer Irreparable Harm.**

A plaintiff is likely to suffer irreparable harm, and is thus entitled to a preliminary injunction, "where no remedy [for the violations the plaintiff has suffered] is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). As an initial matter, "denial of a constitutional right" per se "constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

Further, courts in the Fourth Circuit have recognized that such irreparable harm will occur if, in the absence of preliminary injunctive relief, the plaintiff will "become unable to pay for medicines, clothing, food, fuel, transportation and shelter." *Hyatt v. Heckler*, 579 F. Supp. 985, 995 (W.D.N.C. 1984) (concluding that the "termination and the unjustified denial of Social

Security disability benefits cause irreparable harm to eligible persons"), *vacated on other grounds*, 757 F.2d 1455 (4th Cir. 1985); *see also, e.g., Reed v. Lukhard*, 578 F. Supp. 40, 42 (W.D. Va. 1983) ("The hunger or indignities that one may have to suffer from the unavailability of funds cannot be fully remedied by future payment of those sums . . . [w]hen the money is essential for life's basic necessities").  Loss of housing and the inability to access needed medical care are, in particular, well-settled examples of irreparable harm.  *See Jackson v. City of Aiken Hous. Auth.*, No. 1:16-CV-02831-JMC, 2016 WL 7228242, at *5 (D.S.C. Dec. 14, 2016) ("The imminent threat that Plaintiffs will become homeless without Section 8 assistance constitutes irreparable harm"); *Stanley v. Baltimore Cty., Md.*, No. CIV.A. AMD 06-944, 2006 WL 1238559, at *2 (D. Md. May 5, 2006) (finding irreparable harm where "Plaintiff contends that if defendants terminate her housing assistance she is faced with genuine irreparable harm because she cannot afford to pay market rate rent and will face the prospect of immediate homelessness."); *Poling v. Foxwell*, No. PWG-18-80, 2019 WL 1472304, at *5 (D. Md. Apr. 3, 2019) (concluding that denial of medication and resulting pain amounted to irreparable harm); *Peter B. v. Sanford*, No. CIV.A. 6:10-767-JMC, 2010 WL 5912259, at *9 (D.S.C. Nov. 24, 2010), report and recommendation adopted, No. 6:10-CV-00767-JMC, 2011 WL 824584 (D.S.C. Mar. 7, 2011) ("As a threshold legal matter, numerous federal courts have recognized that the reduction or elimination of public medical benefits irreparably harms the participants in the programs being cut.") (collecting cases).  So too is the "anxiety, depression, and decline in health" inflicted on individuals who, as a result of income loss, can no longer meet their basic needs.  *Hyatt*, 579 F. Supp. at 995.

All six Plaintiffs and the class members they seek to represent have suffered per se irreparable harm arising from Defendant's violation of their basic constitutional right to receive

764843

due process before being deprived of or required to pay back benefits. *Meese*, 818 F.2d at 1135. Further, Plaintiffs and the classes they seek to represent already have suffered or will suffer irreparable harm in the form of inability to pay for "medicines, . . . food, fuel, transportation, and shelter." *Hyatt*, 579. F. Supp. at 995. Because of Defendant's failure to pay his benefits when due, Plaintiff Gorres was unable to pay for his mortgage, utilities, gas, and meals, and has had to take loans from family and access food stamps in order to cover these essential expenses. He also had to go without medications and doctor's visits needed to manage his asthma, hypertension, and diabetes, exacerbating his asthma symptoms. *See Polling*, 2019 WL 1472304, at *5 (denial of medication produces irreparable harm). Plaintiff Gilliam has likewise suffered hunger as a result of Defendant's delays in benefits payment. Without a job or unemployment benefits, she has had to secure food stamps in order to provide for her nine-year old dependent granddaughter. Plaintiff Bosley has been living in a state of limbo; while he has not yet lost his home or transportation, he cannot make basic financial decisions about whether to re-sign his lease or buy a car without knowing whether he will have to remit MDL a large sum in repaid benefits. Declarant Elliott, meanwhile, has had to borrow thousands of dollars to cover basic utilities, lost access to a car and the ability to travel to job opportunities, and nearly became homeless as a result of Defendant's six-month suspension of his benefits. *Stanley*, 2006 WL 1238559, at *2 (noting that "prospect of immediate homelessness" constitutes irreparable harm). Plaintiff Sanders found himself in the same predicament when Defendant withheld part or all of his benefits to recoup an alleged overpayment: he has fallen behind on his rent, he has had to limit driving even in search of employment opportunities to avoid fuel costs, and he, his partner, and his young son have been relying on food pantries and Meals on Wheels to feed themselves. *Reed*, 578 F. Supp. at 42 ("hunger or indignities that one may have to suffer from the

unavailability of funds cannot be fully remedied by future payment of those sums").  In one his

many fruitless chat sessions with an MDL representative, Mr. Sanders shared his plight,

admonishing that because of the agency's non-payment of his benefits "I have no money and my

family is hungry."

     Defendant's actions have created financial crises even for those Plaintiffs, Declarants,

and class members who have some modicum of monetary savings.  Plaintiff Smith and his

fiancée exhausted their savings when Defendant failed to timely pay his benefits, such that they

are now at risk of financial collapse if they face any routine but unplanned expense, like the need

for car repairs.  Declarant Knapp, similarly, depleted all his savings and dipped into his 401(k) in

order to cover his basic expenses following Defendant's delay in payment.  Declarant

Christensen, too, had to take thousands of dollars out of her retirement savings in order pay for

emergency repairs to her home after flooding and repairs to her 14-year old car, which she needs

to care for elderly family members.  At 67 years old, Ms. Christensen's depletion of her

retirement funds jeopardizes her ability to pay for "life's basic necessities" in the near future

when she can no longer work.  *Reed*, 578 F. Supp. at 42.

     Each of these individuals – Plaintiffs Gorres, Gilliam, Smith, Edwards, Bosley, and

Sanders, and Declarants Elliott and Christensen – has also suffered stress, anxiety, panic attacks,

sleeplessness, or depression that flows predictably from their sudden inability to afford basic life

expenses, as has Declarant Lau who feared financial "ruin."  *Hyatt*, 579 F. Supp. at 995.  It

stands to reason that unnamed class members are likely to suffer similarly grave harm, or to have

already suffered it.  *See* Ex. 14, *D.A. v. Hogan*, Case No. 24-C-21-002988, 18-19, 21 (Balt. City

Cir. Ct. Jul. 13, 2021) (memorandum opinion and order granting preliminary injunction and

recognizing that if unemployment benefits are terminated, all "individuals receiving [benefits]" –

in addition to plaintiffs – are likely to suffer harm of great "personal magnitude" including "severe economic hardship").

**C.   The Balance of Equities Favors Plaintiffs and the Classes they Seek to Represent.**

In assessing the request for injunctive relief, Courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).  Here, the balance tips decidedly in favor of the Plaintiffs and the classes they seek to represent.  In the absence of a preliminary injunction requiring Defendant to promptly process and pay claims, many will face housing loss, inability to secure needed medical care, lack of access to transportation, hunger, and attendant threats to their mental health, while all will be subjected to the infringement of their constitutional rights.  *See supra,* Part II.B.  By contrast, an order for injunctive relief would subject Defendant only to the administrative cost associated with making eligibility determinations, processing payments, and affording adequate process, and the financial expense of awarding benefits the agency was already required to pay out of previously allocated and partly federally reimbursable funds.  Neither burden is significant enough to outweigh the harm to Plaintiffs.  *See, e.g., Hyatt*, 579 F. Supp. at 995 ("work and expense necessary to locate and reevaluate the files of [] affected [benefits recipients] will produce no serious hardship upon the state or federal administrators"); *Jackson*, 2016 WL 7228242, at *6 ("the financial impact on Defendants [of providing Housing Choice Vouchers] would appear to be minimal since they would be using the funds already allocated for HCV payments").

764843

**D.  Injunctive Relief Will Serve the Public Interest.**

A well-functioning unemployment insurance system – which guarantees early and uninterrupted payment on qualified claims – serves the public interest by "maintain[ing] the recipient[s] at subsistence levels without the necessity of [their] turning to welfare or private charity," "assisting [] worker[s] to find substantially equivalent employment" and "prevent[ing] a decline in the purchasing power of the unemployed, which in turn serves to aid industries producing goods and services."  *Java*, 402 U.S. at 132; *see also* Md. Lab. & Empl. 8-102 (memorializing legislative findings that "involuntary unemployment is a subject of general interest and concern that requires appropriate action . . . to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker" and that "security for society can be provided by . . . the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing power and limiting the serious social consequences of poor relief assistance").  Such an efficient and equitable system would also serve racial equity by helping to narrow the current gap between Black and white Marylanders' receipt of unemployment benefits.[40]

Plaintiffs' requested preliminary injunctive relief seeks just that:  a correction of MDL's current policies, practices, and customs for managing benefits determinations and payments, which are failing Maryland residents and resulting in widespread violations of law, to ensure that

---

[40] *See* Ava Kofman and Hannah Fresques, *Black Workers Are More Likely to Be Unemployed but Less Likely to Get Unemployment Benefits*, ProPublica, Aug. 24, 2020, https://www.propublica.org/article/black-workers-are-more-likely-to-be-unemployed-but-less-likely-to-get-unemployment-benefits; Kyle K. Moore, *State unemployment by race and ethnicity*, Economic Policy Institute, Nov. 2021, https://www.epi.org/indicators/state-unemployment-race-ethnicity/ (last visited Nov. 23, 2021) (showing that in the 3rd quarter of 2021, white Marylanders had an unemployment rate of 5.2 % while Black Marylanders had an unemployment rate of 6.9%).

764843

eligible unemployed workers receive payment when due and in accordance with statutory procedures and constitutional due process. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest.").

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs seek a preliminary injunction on behalf of themselves and the Delay, Continuing Claims, and Overpayment Classes requiring Defendant to (a) promptly determine and pay all unemployment benefits when due, whether on initial application or during continued claim status, and (b) afford notice and an opportunity to be heard with regard to all unemployment overpayment claims.

Dated: November 24, 2021                    Respectfully submitted,

**PUBLIC JUSTICE CENTER**


_____/s/_____

Sally Dworak-Fisher, Fed. Bar No. 27321
Monisha Cherayil, Fed. Bar No. 18822
David Rodwin, Fed. Bar No. 18615
Tyra M. Robinson, Fed. Bar No. 21289
201 North Charles Street, Suite 1200
Baltimore, Maryland 21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423
dworak-fishers@publicjustice.org
cherayilm@publicjustice.org
rodwind@publicjustice.org
robinsont@publicjustice.org


**GALLAGHER EVELIUS & JONES LLP**


_____/s/_____

Paul S. Caiola, Fed. Bar No. 2394
218 North Charles Street, Suite 400
Baltimore, Maryland 21201

764843

Telephone: (410) 727-7702
Facsimile: (410) 468-2786
pcaiola@gejlaw.com

*Attorneys for Plaintiffs*

764843