| | |
|---|---|
| D.A., *et al.*, | IN THE |
| **Plaintiffs,** | CIRCUIT COURT |
| **v.** | FOR BALTIMORE CITY |
| LARRY HOGAN, in his official capacity as GOVERNOR of the State of Maryland, *et al.*, | Case No. 24-C-21-002988 |
| **Defendants.** | |
| LEONARD HARP, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Case No. 24-C-21-002999 |
| GOVERNOR LARRY HOGAN, *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

These two actions are not consolidated.  The Court heard them together and issues this Memorandum Opinion and the accompanying Preliminary Injunction jointly in both actions because of the similar issues raised and relief sought in both actions.

Plaintiffs in both actions include Maryland residents who currently receive one or more of several types of expanded or supplemental unemployment benefits made available to the states by the federal government under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act and/or the American Rescue Plan Act of 2021 ("ARPA").  There are six individual Plaintiffs in *D.A., et al. v. Hogan, et al.*, Case No. 24-C-21-002988.  There are also six individual Plaintiffs in *Harp, et al. v. Hogan, et al.*, Case No. 24-C-21-002999.  The *Harp* Plaintiffs also seek to represent a class of allegedly similarly situated persons.  The Defendants in both actions are Governor Larry Hogan and Maryland Secretary of Labor Tiffany P. Robinson.

EXHIBIT 14

The Court issued a Temporary Restraining Order jointly in both actions on July 3, 2021 at 10:00 a.m.  Both actions are now before the Court on Plaintiffs' requests for preliminary injunctive relief.  The parties have briefed the issues extensively, and the Court conducted an evidentiary hearing by remote electronic means pursuant to Maryland Rule 2-803 on July 12, 2021.  The Court commends all counsel for presenting complex and contested issues in a short time and with a very high degree of cooperation.

### Procedural History

The *D.A.* Plaintiffs filed their action on June 30, 2021.  They filed with their Complaint a Motion for Temporary Restraining Order and Preliminary Injunction (Paper No. 3).  Defendants removed the action to the United States District Court for the District of Maryland on July 1, 2021.  On the same day, however, Judge Richard D. Bennett granted Plaintiffs' Emergency Motion for Remand to State Court and remanded the action to this Court.  Defendants filed a Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction on July 2, 2021 (Paper No. 3/1).  The *D.A.* Plaintiffs filed a reply memorandum (Paper No. 3/2).

The *Harp* Plaintiffs initially filed an earlier action in this Court, which Defendants removed to federal court.  The *Harp* Plaintiffs chose to dismiss that action in federal court, and they then filed this action on July 1, 2021.  The *Harp* Plaintiffs appended a Motion for Temporary Restraining Order and Emergency Hearing (Paper No. 2) to their Verified Class Action Complaint (Paper No. 1).  Within the prayers for relief in their Complaint, they have requested preliminary injunctive relief.  Defendants also filed a Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction on July 2, 2021 (Paper No. 2/1).

2

The Court conducted a joint hearing on the requests for a temporary restraining order on July 2, 2021 by remote electronic means using Zoom for Government pursuant to Maryland Rule 2-802.  All parties appeared by counsel.  The Court issued a Memorandum Opinion and Temporary Restraining Order the next morning, July 3, 2021, at 10:00 a.m.  The Temporary Restraining Order is effective for ten days, until July 13, 2021 at 10:00 a.m.  Also on July 3, 2021, this Court denied a stay of enforcement of the Temporary Restraining Order.[1]  Defendants sought appellate review of the Temporary Restraining Order, but it has remained in effect.

On July 6, 2021, the first business day after the July 4 holiday, the Court held a conference with counsel for all parties to schedule proceedings on the requests for preliminary injunctive relief.  The Court initially scheduled an evidentiary hearing to begin at 2:00 p.m. on Friday, July 9, 2021, and to continue to July 12, 2021.  Counsel undertook productive discussions over the possibility of limited formal or informal discovery to prepare for the hearing.  On July 9, 2021, counsel asked for a further conference with the Court and jointly requested postponement of the beginning of the hearing.  The Court granted the request and postponed the start of the hearing to 9:30 a.m. on July 12, 2021.

In addition to the memoranda submitted before issuance of the Temporary Restraining Order, the Court has and has considered the following memoranda on the issues:[2]

- Supplement to [*D.A.*] Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining order and Preliminary Injunction (Paper No. 3/7 in No. 24-C-21-002988);

---

[1] The Court realized in preparing this Memorandum Opinion that the order denying the stay was not docketed because the Court issued it from home.  The Court will have it docketed now.  The Court also notes that Defendants' notices of appeal transmitted to the Court electronically on Saturday, July 3, 2021 also have not been docketed.

[2] There are some irregularities in the way papers are docketed in the two actions.

- [*Harp*] Plaintiffs' Memorandum in Support of Prayer for Preliminary Injunctive Relief (Paper No. 5 in No. 24-C-21-002999);

- Defendants' Response to Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Paper No. 3/8 in No. 24-C-21-002988 and Paper No. 2/6 in No. 24-C-21-002999);

- Defendants' Bench Memorandum and Opposition to Plaintiffs' Motions for Preliminary Injunction (Paper No. 11 in No. 24-C-21-002988; captioned but apparently not yet docketed in No. 24-C-21-002999);

- [*D.A.* Plaintiffs'] Response to Defendants' Bench Memorandum and Reply Memorandum in Further Support of Plaintiffs' Motion for Preliminary Injunction (Paper No. 11/2 in No. 24-C-21-002988);

- Defendants' Reply to Plaintiffs' Response to Defendants' Bench Memorandum (Paper No. 11/1 in No. 24-C-21-002988 and Paper No. 11 in No. 24-C-21-002999);

- Defendants' Motion to Dismiss the D.A. Amended Complaint (Paper No. 15 in No. 24-C-21-002988);

- Defendants' Motion to Dismiss (Paper No. 9 in No 24-C-21-002999); and

- Memorandum in Support of Defendants' Motion to Dismiss the D.A. Amended Complaint and Harp Complaint (Paper No. 15 in No. 24-C-21-002988 and Paper No. 8 in No. 24-C-21-002999).

In the midst of this briefing, the *D.A.* Plaintiffs filed their First Amended Complaint (Paper No. 10).

## Facts and Allegations

As the health threats resulting from accelerating transmission of the novel coronavirus disrupted economic activity in the United States in March 2020, Congress passed and the President signed the CARES Act on March 27, 2020. At issue here are three types of enhanced

unemployment benefits established and funded by the United States government in the CARES Act.  Pandemic Unemployment Assistance ("PUA") provides benefits to people who otherwise would not be eligible for traditional unemployment insurance benefits, including self-employed individuals and workers who could not work because of a lack of childcare assistance.  15 U.S.C. § 9021.  Pandemic Emergency Unemployment Compensation ("PEUC") extended benefits to workers who exhausted the number of weeks of benefits for which they previously were eligible. 15 U.S.C. § 9025.  Federal Pandemic Unemployment Compensation ("FPUC") provided supplemental benefits of $600 per week from March 27, 2020 to July 31, 2020.  15 U.S.C. § 9023.  The ARPA, Pub. L. No. 117-2, then amended the CARES Act to revive this supplemental benefit at a level of $300 per week from December 27, 2020 through September 6, 2021.

To implement these and other unemployment benefit programs, Maryland almost immediately entered into an "Agreement Implementing the Relief for Workers Affected by Coronavirus Act" with the United States Secretary of Labor.  Defs.' Exh. 1.  On June 1, 2021, Governor Hogan wrote to U.S. Secretary of Labor Martin J. Walsh to give notice that "the State of Maryland will end its participation in the unemployment insurance programs listed below, effective at 11:59 p.m. on July 3, 2021."  Defs.' Exh. 3.  Governor Hogan listed for termination the PUA, PEUC, and FPUC programs, as well as the Mixed Earners Unemployment Compensation ("MEUP") program.  Plaintiffs do not include claims about the MEUP program. Governor Hogan offered the following explanation:

> Thanks to Marylanders' resilience and tenacity, our state has seen a dramatic drop in COVID-19 cases, and we have reached the milestone set by President Biden of vaccinating 70% of adults. Businesses large and small across our state are reopening and hiring workers, but many are facing severe worker shortages. While we have experienced 12 straight months of job growth in

> our state, we will not truly recover until our workforce is fully
> participating in the economy.
>
> Our administration, in partnership with your agency, will continue
> working with Marylanders who need reskilling and retraining to
> reach the next stages of their careers.  The comprehensive
> resources available to our customers through a great variety of
> training and apprenticeship programs will continue to serve the
> needs of both Maryland businesses and jobseekers.

*Id.* at 2.

The *D.A.* Plaintiffs allege that Defendants' early termination of enhanced unemployment benefits under the CARES Act would affect more than 300,000 Maryland residents.[3]  First Amended Complaint ¶ 2.  But for the State's early termination of its participation in those programs, those benefits would continue until September 6, 2021.  At stake when these actions were filed was nine weeks or just over two months of additional benefits.  Plaintiffs allege, and Defendants do not dispute, that these benefits are funded entirely by the federal government. The evidence shows that the federal government also reimburses Maryland for most but not all the costs of administering these benefits.

The six *D.A.* Plaintiffs allege that each of them currently receives some combination of PUA, PEUC, and/or FPUC unemployment benefits.  First Amended Complaint at ¶¶ 9-44.  Their benefits range from $476 to $730 per week.  *Id.*  Each alleges that she or he lost work as a result of the pandemic and has been unable to find a suitable new job.  All except A.M.[4] allege that all of their current unemployment benefits would end if an injunction is not issued.  *Id.*

---

[3] This appears to be based on the allegation that 304,013 Marylanders were receiving some form of unemployment benefits on May 29, 2021.  First Amended Complaint ¶ 80.  Although no more current figure was provided in the evidence, the number of current recipients of PUA, PEUC, and/or FPUC benefits appears to be very large, but less than 300,000.  The evidence is not clear to the Court, but a discrepancy might be due to recipients, like most of the *D.A.* Plaintiffs, who receive more than one category of the enhanced unemployment benefits.

[4] Three of the six *D.A.* Plaintiffs identify themselves by initials only.

Plaintiff A.M. receives both regular unemployment insurance benefits and FPUC benefits, so his regular unemployment benefits would continue.  *Id.* ¶ 28.

The *D.A.* Plaintiffs assert four claims.  In Count I, they seek a declaratory judgment that the Defendants' early termination of enhanced unemployment benefits would violate Title 8 of the Labor and Employment Article of the Maryland Code and the Maryland Constitution.  They do not specify what Constitutional provision is implicated in this count.  In Count II, Plaintiffs seek a similar declaratory judgment that the Defendants' early termination of enhanced unemployment benefits would violate Article 24 or the Maryland Declaration of Rights.  Plaintiffs added Count III after the Court issued its Temporary Restraining Order.  In that count, Plaintiffs seek a declaration, apparently based on contract law, that if the Court denies further injunctive relief, Defendants must give a new thirty-day notice of their intention to terminate the enhance benefit programs before the programs can be terminated.  In Count IV, Plaintiffs request temporary, preliminary, and permanent injunctive relief either (1) enjoining termination of the enhanced benefit programs or (2) in the alternative, requiring Defendants to give another thirty-day notice before termination.

The six *Harp* Plaintiffs assert claims for themselves and on behalf of an alleged class of similarly situated plaintiffs.  Only two of the six Plaintiffs – Plaintiffs Langford and Evans – allege that they currently are receiving enhanced unemployment benefits that they would lose because of Defendants' early termination of those programs.  Complaint ¶¶ 17-19.  Plaintiffs Harp and Wilson allege that they lost work because of the pandemic and have never received unemployment benefits because of errors in the administration of the benefit programs.  *Id.* ¶¶ 6-11.  Plaintiffs Pennix and Ceci allege or at least suggest that they received Maryland unemployment benefits at one time during the pandemic but that they are not now receiving benefits, also as a result of errors in the administration of the benefit programs.  *Id.* ¶¶ 12-16.  At

7

least by implication, these latter four Plaintiffs appear to allege that they should be receiving

benefits under one or more of the enhanced unemployment benefit programs.  The *Harp*

Plaintiffs seek to represent two subclasses of plaintiffs: Subclass A of plaintiffs who are

receiving enhanced unemployment benefits and would lose them if Defendants terminate the

programs early and Subclass B of plaintiffs who wrongfully have not received those enhanced

benefits.  *Id.* ¶¶ 43-44.

The *Harp* Plaintiffs assert three claims.  In Count I, they seek a declaratory judgment that

Governor Hogan's early termination of enhanced unemployment benefits would violate Title 8

of the Labor and Employment Article of the Maryland Code.  In Count II, Plaintiffs request

temporary, preliminary, and permanent injunctive relief to enjoin early termination of the

enhanced benefit programs.  In Count III, they seek declaratory relief that Defendant Robinson

has failed to administer the unemployment insurance benefit programs in compliance with

Title 8 of the Labor and Employment Article during the pandemic.  At the temporary restraining

order hearing, counsel stated that the *Harp* Plaintiffs on the current motions are seeking relief

only with respect to the early termination of the enhanced benefit programs.

At the evidentiary hearing on July 12, 2021, all parties agreed that Plaintiffs in both

actions would rely on the affidavits filed by all twelve Plaintiffs without the need for cross-

examination of any of them.  Plaintiffs also submitted fourteen exhibits by stipulation.[5]  Later in

the hearing, Defendants stipulated to admission of two additional Plaintiffs' exhibits, Plaintiffs'

Exhibits 15 and 16.  Defendants initially submitted by stipulation Defendants' Exhibits 1-8, 13-

---

[5] The stipulations by all parties were only to the admissibility of exhibits and not to the truth of the statements in the exhibits.  Defendants stipulated to consideration of Plaintiffs' affidavit testimony without cross-examination but not to the truth of that testimony.  Plaintiffs later in the hearing stipulated to admission in evidence of Defendant Robinson's affidavit.  She was subject to cross-examination.

17, 19, and 21-23.  Later in the hearing, Defendants' Exhibits 9 and 24 also were admitted without objection.  Defendants called four witnesses to testify: Michael Siers, an economist with the Maryland Department of Commerce; Neil Bradley, Executive Vice President of the United States Chamber of Commerce; John Kashuba, a senior policy advisor to the Maryland Secretary of Labor; and Maryland Secretary of Labor Tiffany P. Robinson.  The Court had the opportunity to observe the demeanor of all of the witnesses as all appeared by high-quality video and audio connections through Zoom for Government.  The Court found all of the witnesses to be forthright and cooperative in their testimony on both direct and cross-examination.

<u>**Discussion**</u>

Plaintiffs bear the burden of establishing the basis for granting a preliminary injunction. *Ademiluyi v. Egbuonu*, 466 Md. 80, 115 (2019).  Plaintiffs must establish four factors weighing in favor of an injunction: (1) the likelihood of success on the merits; (2) the "balance of convenience" or "balance of harms," determined by weighing whether greater injury would be done to Defendants by granting an injunction than to Plaintiffs by denying one; (3) that Plaintiffs will suffer irreparable harm unless an injunction is granted; and (4) the public interest.  *Id.* at 114; *Dep't of Transp. v. Armacost*, 299 Md. 392, 404-05 (1984).  All four factors must be present for Plaintiffs to be entitled to a preliminary injunction.  *Ademiluyi*, 466 Md. at 115.

    1.    **Likelihood of Success on the Merits**

        a.    **Article 24 of the Maryland Declaration of Rights**

Invoking *Ehrlich v. Perez*, 394 Md. 691 (2006), Plaintiffs claim the State's early termination of unemployment benefits for them draws impermissible distinctions that result in a violation of their equal protection rights recognized under Article 24 of the Maryland Declaration of Rights.  Based on the Court's finding of no likely success on this claim in

connection with the Temporary Restraining Order, Plaintiffs offered minimal argument on this claim at the preliminary injunction hearing, but they declined to concede the issue.

Plaintiffs do not place themselves in any demographic category that would establish or even allege a suspect classification leading to strict or elevated constitutional scrutiny. Indeed, Plaintiffs strain to articulate any categories of differentiation at all. They advance allegations that about 85% of the Marylanders who are receiving unemployment benefits under one of the enhanced programs at issue are receiving unemployment benefits *only* under those programs. They suggest that this creates an irrational distinction. If early termination of the enhanced programs is carried out, this means that 85% of those affected will then receive no unemployment benefits at all, while 15% will continue to receive some benefits because they have some residual eligibility for unemployment benefits under the State's existing standard program of benefits. According to Plaintiffs, this is not a rational way to carry out the Governor's stated goal of encouraging workers to return to work. Some allegedly will be more encouraged than others.

The Court still sees no chance of success for Plaintiffs on this claim. The classifications that have been made have been made at a program level. For example, benefits have been extended to individuals who are or were self-employed even though they previously were not qualified for unemployment benefits. Or an amount – currently $300 per week – has been added to whatever benefits a class of eligible or once-eligible workers receive. The Governor's action would end benefits for whole classes of recipients at the program level, with no discrimination within each separate program. If the result is that one person is left with no benefits at all while another person retains some benefits under a remaining program, the reason is not because the early termination treats similarly situated people differently but because some people have some remaining residual eligibility under the standard unemployment benefit program. Put another

way, any discrimination or differentiation would result from the eligibility criteria of the programs themselves. Those distinctions were created when the individual programs were created and are not the result of the early termination of certain programs. The Court concludes that Plaintiffs are not likely to succeed on the merits of their Article 24 claims.

### b.     Title 8 of the Labor and Employment Article of the Maryland Code

Plaintiffs advance a very different statutory claim based on Title 8 of the Labor and Employment Article of the Maryland Code. The claim centers on § 8-310(a)(1), which provides:

> In the administration of this title, the [Maryland] Secretary [of Labor] shall cooperate with the United States Secretary of Labor to the fullest extent that this title allows.

*Id.* § 8-310(a)(1). The Court concludes that Plaintiffs are likely to succeed in establishing that this provision operates in this context as a mandate requiring the Maryland Secretary of Labor to cooperate in accessing any federal benefits that are available to Marylanders within the bounds of Title 8.

The first goal of statutory interpretation is to ascertain and implement the intention of the General Assembly. *Wheeling v. Selene Finance LP*, 473 Md. 356, 250 A.3d 197, 209 (2021). The starting point for this exercise, and sometimes the ending point, is the normal, plain language used. *Id.* Plain language is not read in isolation:

> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

*Id.* (quoting *Lockshin v. Semsker*, 412 Md. 257, 275-76 (2010)).

Defendants isolate "cooperate," immediately associating it as "a common term of art employed when the federal government provides funding to states pursuant to conditions," Defs.' Bench Memo. at 4, and aligning it with the concept of "cooperative federalism," *id.* at 6-8.  In doing so, Defendants make two mistakes.  First, they detach "cooperate" from the other critical language of the provision.  The Maryland Secretary is charged to "cooperate . . . to the fullest extent that this title allows."  Those simple words are both expansive and limiting.  Second, Defendants fundamentally misstate the operation of federalism in this context.

Defendants' dictionary starting point is useful.  "Cooperate" means "to act or work with another or others" or to "act together or in compliance."  Defs.' Bench Memo. at 6 (quoting https://www.merriam-webster.com/dictionary/cooperate (last visited July 8, 2021)).  The second definition from the same source is also useful: "to associate with another or others *for mutual benefit*."  https://www.merriam-webster.com/dictionary/cooperate (last visited July 12, 2021) (emphasis added).  The American Heritage Dictionary of the English Language stresses this idea of mutual benefit: "To work or act together *toward a common end or objective*." https://ahdictionary.com/word/search.html?q=cooperate (last visited July 12, 2021) (emphasis added).  Defendants leap immediately from this idea of mutuality to an implied rejection in the statute of "an absence of discretion or complete obeisance to federal authority."  Defs.' Bench Memo. at 6.  Defendants ignore almost completely the stronger phrase in the statute: "to the fullest extent."  This is plain language of maximization, especially when associated with the command "shall."  This Court is not free to ignore the General Assembly's mandatory direction that the Maryland Secretary must go as far as possible in cooperation with the United States Secretary of Labor to achieve "a common end or objective."

Defendants argue that the section deals only with administrative cooperation and is limited by the specific reporting and expenditure requirements in § 8-310(a)(2).  But the

structure of the statute belies such a limitation.  Sub-subsection 8-310(a)(1), containing the
"fullest extent" command, stands alone as a sentence with a broad and generalized requirement.
Sub-section 8-310(a)(2) has its own separate command – "The Secretary shall . . ." – preceding
the three specific administrative actions.  Even there, those three actions show breadth of
application.  The first two involve reporting to the federal Labor Secretary, but the third item
involves compliance with federal regulations that "govern the expenditure of any money that
may be allotted and paid to the State" for administration.  *Id.* § 8-310(a)(2)(iii).  Thus, while all
the items are administrative, they include the administration of federal funding.  Structurally, the
command that the Maryland Secretary "*shall* cooperate" with the federal Secretary "to the *fullest*
extent" also contrasts with the discretion accorded in subsection (b) that she "*may* afford
*reasonable* cooperation" with other federal units.  *Id.* § 8-310(b)(1) (emphasis added).

Defendants seek to diminish the significance of the grammatical or structural separations
in § 8-310(a)(1) and (a)(2) by pointing out that this structure evolved from a statutory version in
which the clauses were separated by semicolons instead of a period.  Defendants point out that
the period and the separation of the sub-subsections occurred in a 1991 recodification that was
deemed not to involve substantive changes.  The grammatical distinctions existed before the
punctuation and structural modification.  As quoted by Defendants, *see* Defs.' Bench Memo. at
9, the original "shall cooperate to the fullest extent consistent with [Maryland law]" was
separated by a semicolon from "shall make such reports" and "shall comply with such
provisions" and "shall comply with the regulations."  Indeed, the second and third of these
commands, both related to reporting, were grouped together within one semicolon-bounded
clause and separated from the first and fourth commands.  This is nothing but a stylistic change.
There has never been a blurring of these requirements, such as would be the case if the statute

provided "the Secretary shall cooperate to the fullest extent in submitting reports, verifying reports, and complying with regulations concerning expenditures."

Defendants trace the "fullest extent" language to the origins of the statute in 1936 and the Great Depression.  Originally, they say, unemployment relief was state-funded, so cooperating "to the fullest extent" cannot possibly mean accepting any federal benefits that are made available.  Assuming the history is accurate, the Court does not accept the implication as a necessary one.  The statutory language has survived as a key feature of implementation of the unemployment benefit programs through decades as the funding structure has changed.  If maximum cooperation once meant creating a state-funded program consistent with federal requirements, so long as those requirements comported with Maryland law provided in Title 8 or its predecessors, there is no reason why maximum cooperation does not now mean operating the program to administer all benefits made available through federal funding, still only to the extent consistent with Maryland law.

Although Plaintiffs risk placing too much emphasis on the broad legislative findings and purpose provisions behind the State's unemployment insurance system, those broader provisions inform the "common end or objective" toward which the Secretary must "cooperate."  Those provisions identify "economic insecurity due to unemployment" as a "serious menace" and establish the unemployment insurance system as a necessary exercise of the State's police power for "the public good and the general welfare of the citizens of the State."  Md. Code, Lab. & Empl. § 8-102(b)(1), (c).  These broad statements serve as "a guide to the interpretation and application" of Title 8, but the Court does not see in them alone a mandate for the Secretary to maximize all available federal benefits.  In the absence of the "fullest extent" requirement of § 8-310(a), the more general policy prescriptions would not require specific actions by the Maryland

Secretary.  The powerful statements of purpose do, however, support the interpretation of § 8-310(a) as mandating more than just administrative harmony.[6]

Defendants base much of their statutory construction argument on an alleged inconsistency between Plaintiffs' interpretation of § 8-310 and the concept of "cooperative federalism."  At the preliminary injunction hearing, the *D.A.* Plaintiffs' counsel aptly labeled this argument a "parade of horribles."  Defendants see Plaintiffs' argument as requiring a surrender to federal authority – "a state-authorized federal takeover."  Defs.' Bench Memo. at 7.  "[S]tates may not be coerced by the federal government into accepting federal funds or implementing federal programs."  *Id.* (citing the "gun to the head" of the States peril of *National Federation of Independent Business  v. Sibelius*, 567 U.S. 519, 581 (2012)).[7]  There will be "disastrous results,"

---

[6] During the pandemic, the General Assembly adopted 2021 Md. Laws ch. 49 as an emergency measure.  It requires that "the Maryland Department of Labor shall identify all changes in federal regulations and guidance that would expand access to unemployment benefits or reduce bureaucratic hurdles to prompt approval of unemployment benefits."  *Id.* § 3(a).  This is consonant with the mandatory interpretation of § 8-310(a).  The General Assembly expected the Executive branch to be doing everything possible to maximize unemployment benefits available to Maryland residents.

[7] Ironically, in *NBIF v. Sibelius*, the Court cited a case arising from the original funding scheme for state unemployment benefits to illustrate the permissible application of Congress's spending clause powers:

> [*Charles c. Steward Mach. Co. v. Davis*, 301 U.S. 548 (1937)] involved a federal tax on employers that was abated if the businesses paid into a state unemployment plan that met certain federally specified conditions.  An employer sued, alleging that the tax was impermissibly "driv[ing] the state legislatures under the whip of economic pressure into the enactment of unemployment compensation laws at the bidding of the central government." 301 U.S., at 587, 57 S.Ct. 883.  We acknowledged the danger that the Federal Government might employ its taxing power to exert a "power akin to undue influence" upon the States. *Id.*, at 590, 57 S.Ct. 883.  But we observed that Congress adopted the challenged tax and abatement program to channel money to the States that would otherwise have gone into the Federal Treasury for use in providing national unemployment services.  Congress was willing

15

with Maryland "obliged to accept whatever legal conditions were attached to those funds," "no matter how onerous the funding conditions were." *Id.* at 14 (some emphasis deleted).

In reality, there is no threat of federal compulsion here at all. The statute, read as a whole, requires the Maryland Secretary to cooperate with the federal Secretary "to the fullest extent *that this title allows*." Md. Code, Lab. & Empl. § 8-310(a) (emphasis added). The statute thus carries its own protection against federal coercion because the Maryland Secretary is not required to agree to any funding or conditions that are not consistent with *Maryland* law. Thus, the real constraint here is not that the Maryland Secretary must bend to federal dictates, but that she must maximize efforts as provided by the General Assembly. The regulation of governmental power here is not between the two sovereigns of the United States and Maryland governments, it is between the two policy-making branches of State government. The General Assembly has used strong language to require maximization of effort in relation to the federal government in providing unemployment relief for Maryland residents. The Maryland Secretary is bound *by Maryland law*, not federal law, to maximize those available benefits.

---

to direct businesses to instead pay the money into state programs only on the condition that the money be used for the same purposes. Predicating tax abatement on a State's adoption of a particular type of unemployment legislation was therefore a means to "safeguard [the Federal Government's] own treasury." *Id.*, at 591, 57 S.Ct. 883. We held that "[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power." *Ibid.*

In rejecting the argument that the federal law was a "weapon[ ] of coercion, destroying or impairing the autonomy of the states," the Court noted that there was no reason to suppose that the State in that case acted other than through "her unfettered will." *Id.*, at 586, 590, 57 S.Ct. 883.

*NFIB v. Sebelius*, 567 U.S. at 578-79.

16

The specific context of this dispute well illustrates the fallacy of Defendants' cooperative federalism argument. No doubt there are situations where the federal government seeks to impose substantial conditions on access to federal funds or even seeks to induce adoption of particular policies through exercise of its spending powers. Here, however, there is no dispute that the federal government has made these enhanced unemployment benefits optional for the states. There is also no dispute that the benefits themselves are being paid entirely with federal funds. The Court accepts Secretary Robinson's testimony that these programs are certainly not cost-free to Maryland. Even though the federal government theoretically will pay all of the administrative costs incurred with the programs, the reality is that Maryland is unlikely to be reimbursed for all of its costs, by a significant margin. Secretary Robinson estimates an administrative expense shortfall of $60 million by the end of the calendar year. Even if that is over-estimated, it is a significant State burden, although it appears to be a total estimate for the programs, not an estimate limited to the two-month period at stake in this case. But the point is that *any* compulsion that is operative here comes not from the federal government, but from State law.

For Defendants, the ultimate extension of the federalism argument is federal preemption. Defendants suggest that a State-law requirement that Maryland must avail itself of benefits that are available for Maryland residents somehow makes it impossible for the federal government to carry out its objective to make these benefits optional. This is backward. Conflict preemption arises when there is a federal mandate and a state acts to thwart it with a law that cannot be obeyed consistent with the federal requirement. Here there is a federal *option*. Defendants are suggesting that by continuing to accept available benefits for another two months on the same terms on which Maryland has accepted them for more than a year, Maryland suddenly will be acting to thwart a federal program.

17

In the Court's opinion, Plaintiffs' likelihood of success depends on this construction of Maryland law as creating a mandate for executive officials to seek and to obtain all federally funded benefits that are available to the State.  In the absence of such a mandate that controls executive discretion, Plaintiffs are left to debate the wisdom of the Governor's strategy as a matter of policy.  In any such debate, the Governor and the Secretary of Labor are entitled to very substantial deference in framing public policy and strategy for the State if the statutory framework leaves them that scope of discretion.  Much of the testimony at the hearing was about that debate.  Some of that evidence is relevant to the other three preliminary injunction factors and is discussed below, but it is not the Court's function to adjudicate that policy debate on the merits.  The Court concludes that Plaintiffs are likely to prevail on the merits not because they necessarily have the better policy position, but because the "fullest extent" language of § 8-310(a)(1) should be interpreted in this context to constrain administrative discretion and to require the Maryland Labor Secretary to maximize use of any available federal unemployment benefits.

### 2.    Balance of Harms

The Court must examine the harm that would be experienced by each party with or without issuance of a preliminary injunction and then compare those relative harms.

Plaintiffs have shown by very particularized affidavits that they face significant personal hardship if their remaining unemployment benefits terminate now rather than on September 6, 2021.  Plaintiffs have been strained economically and emotionally by the pandemic.  In its global scope and in the anxiety that almost all people experience over the threat of disease, the impact of the pandemic has been universal, but the brief stories of these Plaintiffs reminds the Court that the impact of the pandemic has been cruelly uneven.  Some have suffered death or debilitating illness themselves, in their families, or among their friends.  Others have experienced severe

18

economic hardship from involuntary unemployment or the inability to work because of the need

to take on childcare and elder care responsibilities.  As one who has enjoyed the privilege of

continuous, secure employment, the Court is particularly struck by the plight of those who have

had to struggle with irregular or no employment.  To their credit, Defendants, along with

officials at every level of government, have devoted themselves to the effort to ameliorate these

problems.  The Court has no doubt that Defendants have made and are continuing to make very

difficult decisions in all good faith.

      With their evidentiary presentation at the preliminary injunction hearing, Defendants

have shown that the State will experience harm if a preliminary injunction is granted.  The Court

was impressed by Secretary Robinson's testimony to the magnitude and complexity of the effort

required of her Department to administer these enhanced unemployment benefits.  Although the

cost of the enhanced benefits themselves is a federal responsibility, it is clear from the evidence

that the State will bear some additional costs of administration from these programs.  More

difficult is trying to focus on the increased costs associated only with continuing the enhanced

benefits for a longer period because of a preliminary injunction.  At the narrowest level, the

Department of Labor states that it has experienced additional costs to prepare its systems for

early termination of the enhanced benefit programs and then scrambling to return those systems

to functionality with the forced continuation of the benefits.  The Court accepts that there is no

simple on-off switch here and that these are real costs, but they were predictable in the decision

to terminate benefits before the natural expiration of the programs.

      More broadly, the Secretary has presented her estimate that federal reimbursement of

administrative costs for the enhanced benefit programs by the end of 2021 will fall

approximately $60 million short of the actual costs, placing that burden on the State budget.

Without necessarily accepting the accuracy of the estimate, the Court accepts Defendants'

showing that the programs as a whole will impose significant costs on the State.  This estimate, however, is an estimate of the shortfall for the entire programs, not limited to the two-month period of continued benefits.  That amount should be only a fraction of the total amount of the shortfall.  Moreover, if Plaintiffs ultimately are correct, these are the costs of public administration of programs that the State has a duty to administer.

There is an additional element in Defendants' evidence.  A significant emphasis of Mr. Kashuba's and Secretary Robinson's testimony was on the problem of fraudulent applications for benefits.[8]  The Court accepts that testimony and finds that these programs have attracted a profound increase in the number of people applying fraudulently for benefits, including many attempts to use identity theft to obtain benefits falsely.  The Department has had to devote large amounts of resources to combatting this fraud, and the problem has complicated the effort to get benefits to legitimate and deserving applicants.  To the extent Defendants argue this fact is a justification for early termination of the programs because doing so might save money, the Court rejects the argument as a consideration in the balance of harms.  Unemployed Maryland residents should not be penalized by the criminal activities of bad actors.  Although one could rationally limit or change a program because of the risk of fraudulent activity, these programs have been administered for more than one year with this problem.  To say now that there is a new or increased risk of fraud for a two-month period is not supported by the evidence. This is not a new or unusual cost, and it should not be considered in the calculus of an appropriate saving the State might achieve by terminating benefits early for people who are not involved in any fraud.

---

[8] Although Mr. Kashuba testified that he drafted the Governor's June 1, 2021 termination letter to the United States Secretary of Labor, this concern with rampant fraud was not cited in that letter as a reason to terminate the programs.

Balancing these harms, the balance tips in favor of Plaintiffs and issuing a preliminary injunction.  The personal magnitude of the harm associated with losing benefits for Plaintiffs and other individuals currently receiving them is greater than the purely fiscal impact on the State of being required to continue to administer these benefits.

**3.      Irreparable Harm**

Plaintiffs clearly face the threat of irreparable harm if a preliminary injunction is not granted.  Although "only" money is at stake, the potential consequences are irreparable because it is very unlikely that any Plaintiff would gain payment of lost benefits at some time in the future.  If this were a situation in which Plaintiffs claimed that Defendants had made or were making legally or factually incorrect eligibility determinations, it might be possible that the errors ultimately could be addressed by a lump sum award of benefits that were due.  Here, however, there is no dispute about most of the Plaintiffs' eligibility.  They allege instead that they will lose benefits because Defendants choose to terminate access to a federal source of benefits that otherwise would continue to provide them benefits.  If the Court denied injunctive relief and then later determined that Defendants should not have terminated the programs early, it is extremely unlikely that access to the federal funds that the State abandoned could be restored.  This alone amounts to irreparable harm.

In addition, Plaintiffs have shown in their affidavits with varying degrees of severity that the immediate loss of benefits, when some of them already are in vulnerable financial condition, likely will lead to loss of housing, short-term diversion of effort to less valuable employment, and/or significant emotional consequences.  These non-monetary effects would never be compensated and therefore add to the threat of irreparable harm.

In this respect, before the Court issued the Temporary Restraining Order, Defendants mistook the assessment of the *status quo* that is to be preserved.  Defendants argued that

Governor Hogan had already acted to terminate Maryland's participation in the enhance benefit programs, so the *status quo* was termination and that termination should be preserved.  In the Court's view, the proper perspective is to look at the situation that existed before the challenged action was taken.  The *status quo* today for each individual Plaintiff is she or he is receiving benefits.  The action that Plaintiffs challenge has been announced and put in motion, but the change in the *status quo* has not yet occurred because their benefits have not yet ended.  Most important, in this particular situation, there is still an opportunity to preserve that status during a period of further examination of the issues.  Defendants argue that the U.S. Department of Labor has already acknowledged the impending termination, but Plaintiffs have rebutted that by submission of an email from the same federal official indicating that there is still time for Maryland to rescind its termination and to remain in the enhanced benefit programs.

Plaintiffs have satisfied the requirement to show irreparable harm.

### 4.      The Public Interest

Plaintiffs and Defendants offer competing views of what is best for the public good at this particular moment in Maryland's recovery from the pandemic.  Because the statute controls on the merits, the Court has no role in deciding these issues on the merits.  The Court must consider them briefly, however, in assessing whether a preliminary injunction is in the public interest.

At the outset of these actions, the policy question seemed relatively focused: Are the enhanced unemployment benefits creating a disincentive for unemployed Marylanders to return to available employment?  On the one hand, Defendants have demonstrated, and Plaintiffs do not dispute, that Maryland has a temporary labor shortage.  On a generalized level, there are a significant number of job openings in the State – perhaps on the order of 300,000 – and employers are having difficulty finding qualified workers to fill those jobs.  On the other hand

and to their credit, every one of Defendants' witnesses acknowledged the complexity of this problem.  Although Defendants established that there are relatively low-wage segments of the workforce in which the average amount of unemployment benefits is equal to or even above the wages available, that is true only in certain segments of the economy.  Defendants' witnesses readily acknowledged that other factors are in play.  Some unemployed workers still fear the risk of disease in the workplace despite the wide availability of effective vaccines.  The pandemic has had a profound impact on childcare availability, both in terms of requiring a parent or other caregiver to be in the home to supervise remote schooling and in terms of the cost and availability of childcare outside the home.  This effect has been particularly dramatic for women in the labor market.  Some labor shortages have been caused by the absence of foreign workers normally available under special visa programs that have been disrupted by the pandemic.  The Court was struck by the lack of disagreement on the basic disincentive hypothesis.  At most, Defendants' evidence suggested that no more than about 20% of unemployed workers surveyed identified the amount of unemployment benefits as a strong factor in causing them not to seek new employment urgently.  Defendants showed that the Governor's announcement of an imminent end to enhanced unemployment benefits likely caused a surge in job seeking, but the dynamic of recovery is complex.

This complexity bears on the public interest as a factor in granting preliminary injunctive relief.  Defendants tout the economic benefits of putting Maryland residents back to work in productive employment.  Even assuming that an early cutoff of unemployment benefits would increase the urgency of job searching and gradually result in increased employment and economic activity, Defendants' witnesses also admitted a downside.  Unemployment benefits themselves stimulate the economy and have a secondary ripple effect.  One can accept the broad proposition that this ripple effect is greater with increased employment, but the focus here must

23

be on just a transition period from now until September 6, 2021.  If the disincentive of

unemployment benefits is real for some relatively small segment of the workforce, the cutoff of

benefits would be real and immediate for almost all currently unemployed Marylanders.  Not all

of those workers will instantly move into new jobs, meaning uneven economic struggles at the

individual level and an immediate loss of economic stimulus at the generalized level.  Moreover,

Congress and the President presumably did not set a September 6, 2021 end to the programs

arbitrarily.  As the pandemic eases in this country, children will go back to school in person,

thereby allowing parents and other caregivers an opportunity to return to more customary family

living patterns.  Those affected parents do not have the ability to start the school year earlier just

because their unemployment benefits are terminated.

The Court concludes that the public interest supports issuance of a preliminary

injunction.  Some economic benefits may be delayed by continuation of enhanced benefits for

two months.  Any delay in such benefits, however, will be balanced by continuation of the

economic stimulus produced by the benefits and by support for displaced workers transitioning

back into available jobs.

### 5.    Alternative Requested Injunctive Relief

In the alternative to the primary preliminary injunction they seek, Plaintiffs ask the Court

to require Defendants to give the United States Department of Labor another thirty-day notice in

the event Defendants were permitted to terminate the enhanced unemployment benefits early.

Although this request is now moot in light of the Court's issuance of a preliminary injunction on

Plaintiffs' primary request, Plaintiffs nevertheless asked the Court to rule on this issue to enable

them to present it on appeal if necessary.  The issue is moot, and the Court will not rule on it.

The Court will comment only that it did not mean its Temporary Restraining Order to control the

contractual relationship between the United States Department of Labor and the Maryland

24

Secretary of Labor on the issue of notice.  Defendants fully complied with the Temporary

Restraining Order by causing the enhanced unemployment benefit programs to be preserved

temporarily in Maryland, and the procedural steps necessary to reinstate the termination, if that

had occurred, would be matters of contract between the two governmental agencies.

### Conclusion

For these reasons, the Court finds that Plaintiffs have satisfied all four requirements for

issuance of a preliminary injunction.  The motions of Plaintiffs in both actions therefore will be

granted, and the Court will issue a separate Preliminary Injunction.

> **The judge's signature appears on the
> original document in the court file.**

July 13, 2021
9:45 a.m.

_____
Judge Lawrence P. Fletcher-Hill
Circuit Court for Baltimore City

| | |
|---|---|
| **D.A.**, *et al.*, | **IN THE** |
| Plaintiffs, | **CIRCUIT COURT** |
| v. | **FOR BALTIMORE CITY** |
| **LARRY HOGAN, in his official capacity as GOVERNOR of the State of Maryland**, *et al.*, | **Case No. 24-C-21-002988** |
| Defendants. | |
| **LEONARD HARP**, *et al.*, | |
| Plaintiffs, | |
| v. | **Case No. 24-C-21-002999** |
| **GOVERNOR LARRY HOGAN**, *et al.*, | |
| Defendants. | |

## PRELIMINARY INJUNCTION

These two actions are not consolidated.  The Court heard them together and issues this Order jointly in both actions because of the similar issues raised and relief sought in both actions.

In Case No. 24-C-21-2988, Plaintiffs D.A., *et al.* filed a Motion for Temporary Restraining Order and Preliminary Injunction (Paper No. 3).  Plaintiffs also filed a First Amended Complaint (Paper No. 10).

In Case No. 24-C-21-2999, Plaintiffs Harp, *et al.* filed a Verified Class Action Complaint (Paper No. 1) including prayers for preliminary injunctive relief.

The parties have filed numerous memoranda supporting their positions, as listed in the Memorandum Opinion issued today.

Following a hearing, the Court issued a Temporary Restraining Order at 10:00 a.m. on July 3, 2021.  By its terms, the Temporary Restraining Order expires at 10:00 a.m. on July 13,

2021.  The Court conducted a joint evidentiary hearing in both actions on July 12, 2021 by remote electronic means using Zoom for Government pursuant to Maryland Rule 2-803.  All parties appeared by counsel and presented testimony and exhibits in evidence.

For the reasons stated in the accompanying Memorandum Opinion, it is this 13th day of July, 2021, at 9:45 a.m., by the Circuit Court for Baltimore City, Part 26, hereby **FOUND** that Plaintiffs in both actions have shown a likelihood that they will succeed on their claims that are pertinent to the relief granted in this Preliminary Injunction.

It is further **FOUND** that Plaintiffs in both actions have shown that the balance of harms to them as compared to the harms to Defendants if this Preliminary Injunction were or were not granted favors the issuance of this Preliminary Injunction.

It is further **FOUND** that Plaintiffs in both actions have shown that they will suffer irreparable harm if this Preliminary Injunction is not issued.

It is further **FOUND** that Plaintiffs have shown that issuance of this Preliminary Injunction is in the public interest.

It is therefore **FOUND** that Plaintiffs in both actions, following a full adversary hearing, have satisfied the four requirements for entry of this Preliminary Injunction on some of the relief sought.

It is further **FOUND** that a waiver of the bond requirement pursuant to Maryland Rule 15-503(c) is appropriate because the amounts involved would make the provision of a bond prohibitive and Plaintiffs would be unable to provide surety or other security for the bond, substantial injustice would result if a preliminary injunction did not issue, and this action is one of extraordinary hardship.

It is therefore **ORDERED** that the Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiffs D.A., *et al.* in Case No. 24-C-21-2988 (Paper No. 3) is

2

**GRANTED IN PART** and **DENIED IN PART** to the extent of Plaintiffs' motion for a preliminary injunction.

It is further **ORDERED** that the prayer for preliminary injunctive relief included by Plaintiffs Harp, *et al.* in their Verified Class Action Complaint in Case No. 24-C-21-2999 is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Defendants, Governor Larry Hogan and Secretary of Labor Tiffany P. Robinson, are enjoined from taking any action that will prevent the State of Maryland from receiving any and all expanded and/or supplemental unemployment benefits available to Maryland residents under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, the American Rescue Plan Act of 2021 ("ARPA"), or any other existing federal source of unemployment benefits to the fullest extent allowed under Title 8 of the Labor and Employment Article of the Maryland Code.

It is further **ORDERED** that Defendants, Governor Larry Hogan and Secretary of Labor Tiffany P. Robinson, shall immediately take all actions necessary to ensure that Maryland residents continue to receive any and all expanded and/or supplemental unemployment benefits available to Maryland residents under the CARES Act, the ARPA, or any other existing federal source of unemployment benefits to the fullest extent allowed under Title 8 of the Labor and Employment Article of the Maryland Code.

It is further **ORDERED** that Defendants, Governor Larry Hogan and Secretary of Labor Tiffany P. Robinson, shall take all necessary steps to ensure that the officers, employees, and agents of the State of Maryland within their direction and control take or refrain from taking action as necessary for Defendants to comply with their obligations under this Preliminary Injunction.

It is further **ORDERED** that nothing in this Preliminary Injunction creates or establishes eligibility in any individual person for expanded and/or supplemental unemployment benefits available to Maryland residents under the CARES Act, the ARPA, or any other existing federal source of unemployment benefits if the individual person would not otherwise be eligible for the specific benefits under application of the eligibility criteria for the particular benefits.

It is further **ORDERED** that nothing in this Preliminary Injunction prevents the Secretary of Labor or the Maryland Department of Labor from ceasing or terminating the benefits of any individual person under the CARES Act, the ARPA, or any other existing federal source of unemployment benefits if the individual person is no longer eligible for the specific benefits under application of the eligibility criteria for the particular benefits.

It is further **ORDERED** that the bond requirement of Maryland Rule 15-503(c) is waived in the particular circumstances of this Preliminary Injunction.

It is further **ORDERED** that this Preliminary Injunction shall be binding on each Defendant immediately upon receipt by him or her of actual notice of this Preliminary Injunction by any means.

It is further **NOTED** that the Court is transmitting this Preliminary Injunction promptly by electronic mail to counsel of record for the parties.

> *Judge Fletcher-Hill's signature appears on the original document in the court file.*

_____
Judge Lawrence P. Fletcher-Hill
Circuit Court for Baltimore City

4